WINTER, Circuit Judge:
This diversity case pits a landlord seeking use and occupancy payments and other damages against his bankrupt tenant’s successor in interest. Judge Wexler granted partial summary judgment against the landlord and, after a bench trial on the *686 landlord’s remaining claims, awarded him $85,946.97 plus interest. We affirm the judgment except insofar as it disallowed the landlord’s claim for damages for the tenant’s failure to remove trade fixtures.
BACKGROUND
In order to make the issues on appeal comprehensible, we review at length the somewhat tangled factual and procedural background of this case. In January 1961, Lafayette Radio Electronics Corporation (“Lafayette”) entered into a lease with Michael Forte, then the owner of an undeveloped tract of land in Syosset, New York. The lease, as amended, covered a period of twenty years ending December 31, 1981, and granted Lafayette rights of renewal for up to thirty years thereafter in ten-year increments. Forte constructed a building according to Lafayette’s specifications, and between 1961 and 1977, pursuant to various lease amendments, expanded the building to suit Lafayette’s needs. Plaintiff Jack Farber, a lawyer and businessman, became the owner of the property in 1978.
As enlarged, the Syosset building measured 185,603 square feet and was served by a large parking area. Prior to 1980, Lafayette used the entire building to operate a warehouse, administrative and executive offices, a repair center, and an executive store. In addition, a 12,000-square-foot area served as Lafayette’s flagship retail store in its 142-store electronics chain. The rent for the entire space was $162,525.71 per year, net payable at the rate of $13,543.81 per month. Under the lease, Lafayette also paid taxes, water and sewer charges, and liability insurance premiums.
On January 4, 1980, Lafayette filed a Chapter 11 petition in bankruptcy but continued to operate under supervision of the court as a debtor in possession. Lafayette made plans to cut back on operations and to reduce its use of the Syosset building to the 12,000-square-foot retail store. During 1980, Lafayette made repeated proposals to Farber for reducing its occupancy, but Far-ber demanded that Lafayette relinquish its three ten-year lease renewal options.
During 1980, Lafayette made the monthly rental payments of $13,543.81 as required by the lease, and Farber accepted them without reservation. Lafayette also paid the insurance premiums and taxes, which amounted to about $1.00 per square foot. From January through June 1981, however, Lafayette sent Farber a monthly check for only $9,000, which he deposited with the endorsement “received on account of rents due.” Lafayette also ceased payments for taxes or insurance during 1981.
Lafayette’s reduced payments began after Lafayette’s President Robert Green-berg told Farber in early January 1981 that Lafayette could afford only $9,000 per month in rent. After that conversation, Farber wrote to Greenberg that it was his “sense of the meeting” that if Lafayette delivered to Farber a “clear-cut, unqualified, unconditional” cancellation of its option right, Farber would use his “best efforts” to lease Lafayette the 12,000 square feet it occupied for its retail operations. Farber proposed a lease of 12,000 square feet at $9.00/foot ($108,000/year or $9,000/month). In response, Greenberg formally surrendered Lafayette’s renewal options in writing on January 14, 1981. On February 12, Greenberg made a restated lease proposal of 6,000 square feet at $9.00/foot and 18,000 square feet at $3.00/foot. This offer totalled $108,000 per year, or $9,000 per month, the same amount that Farber had proposed on January 12.
On February 24, 1981, Lafayette formally moved in the bankruptcy court to reject its lease under 11 U.S.C. § 365. By cross-motion, Farber sought an order requiring Lafayette to pay for use and occupancy of the premises at the rate of $13,543.81 per month (the lease rate) for the months of January, February and March 1981 and for each month thereafter until the premises were vacated. Farber also sought proof from Lafayette that all real estate taxes were paid in full.
By order dated March 24,1981, the bankruptcy court rejected the lease as of February 28, 1981. The court denied Farber’s cross-motion, but preserved Farber’s right *687 to file an administrative claim against the estate “for any deficiency for use and occupancy.” Pursuant to this authorization, Farber instituted an adversary proceeding against Lafayette in bankruptcy court on May 8, 1981. Farber sought an order lifting the Bankruptcy Code’s automatic stay of action against the debtor, see 11 U.S.C. § 362(d) (1982 & Supp. Ill 1985), so that Farber could bring a proceeding to evict Lafayette for payment of less than the full amount of rent for January-March 1981. On May 27, 1981, Farber filed an amended complaint seeking judgment on an administrative claim for use and occupancy at the lease rate plus taxes for the months of January through May 1981, in the total amount of $119,178.00. Up to this point, Farber had made no claim for use and occupancy for any period prior to January 1981. Further, he had consistently alleged that the “reasonable value” of the premises was to be computed at the lease rate plus taxes.
Meanwhile, defendant Wards Co., Inc. (“Wards”), a national retailer of consumer electronics products, had entered the scene as a merger partner for Lafayette. Under the merger agreement, Wards would survive Lafayette at the conclusion of the bankruptcy proceeding and would assume payment of Lafayette’s obligations. The conditions precedent to consummation of the merger included approval by the shareholders of both companies and confirmation of Lafayette’s Chapter XI plan. Further, Wards retained the right to abandon the merger if the claims against Lafayette exceeded specified amounts before confirmation. By court order, Wards advanced Lafayette $2 million for operating expenses pending consummation of the merger.
During April and May 1981, while Far-ber’s adversary proceeding against Lafayette was pending, Wards negotiated with Farber for a new lease under which Wards would occupy a portion of the Syosset building. On May 21, Farber and Wards’ President, Alan Wurtzel, met at the offices of Farber’s real estate broker, Steve Bade-rian. The parties reached an agreement under which Wards would enter into a lease for 4,777 square feet of retail space at net $11.00 per square foot for the first year, net $11.50 per foot for the second year, and net $12.00 for the third year, and 9,576 square feet of warehouse space at a constant gross rate of $4.00 per foot. In a memorandum dated June 19, 1981, Farber confirmed that he had reached an agreement with Wards and set forth the terms as reflected in the notes of the May 21 meeting.
Meanwhile, on June 4, 1981, the return date of Farber’s adversary proceeding against Lafayette, Wurtzel and Farber appeared in the bankruptcy court and executed a handwritten document entitled “Agreement with Jack Farber.” It provided, inter alia, that Wards would lease space beginning July 1, 1981 in accordance with the June 19 memorandum, and that all of Farber’s claims against Lafayette and Wards were to be settled for $100,000. Wards would pay half of this amount in cash and half by performing certain “landlord’s work,” such as installing new walls and electrical wiring. Farber withdrew his claims and the adversary proceeding was, on consent, marked “settled.”
The bankruptcy court thereafter entered an order confirming Lafayette’s reorganization plan and discharging Lafayette from bankruptcy. Under the plan, Lafayette’s unsecured creditors were to receive twelve percent of their claims in full settlement. The order also provided that “[a]ll landlords and other entities which are parties to adversary proceedings and contested matters pending before this Court ... are restrained and enjoined from commencing any proceedings or taking any action against the debtors ... except upon further order of this Court.”
Later in June 1981, the shareholders of both Lafayette and Wards approved the merger by which Wards became the surviving corporation and assumed all of Lafayette’s obligations, including those arising under the reorganization plan. At the time of confirmation, Lafayette was in possession of the entire Syosset building. On June 18, Wards voluntarily relinquished approximately 96,296 square feet of ware *688 house space to Grumman Aerospace, a new tenant acquired by Farber.
Wards and Farber thereupon attempted to finalize the terms of a new lease. Drafts and redrafts were exchanged, but the parties could not agree on a final written lease. Although there was no dispute as to the amount of space, the location, the price per square foot, or the aggregate rent, disagreement persisted over parking, installation of antennas and renewal options.
Hope of resolving these differences evaporated on August 6, 1981, when Farber filed proof of a claim against Lafayette in the bankruptcy court in the amount of $450,000 for “breach of provisions of lease for restoring premises.” [1] One week later, Farber moved to restore his adversary proceeding to the bankruptcy calendar because there could be no “consummation” of the June 4 settlement. The bankruptcy judge denied Farber’s motion and “abstained” from hearing the adversary proceeding, but permitted Farber to proceed against Lafayette and Wards in state court. The bankruptcy judge’s order provided that any final order or judgment of the state court was to be treated in accordance with Lafayette’s confirmed reorganization plan.
Farber then commenced the present action against Wards in Supreme Court, Queens County, asserting claims for rent, use and occupancy, taxes, insurance, and damages upon surrender of the premises. His claims again related only to Wards’ possession during 1981, which had ended on October 31. Instead of seeking recovery at the lease rate, however, Farber now sought use and occupancy payments total-ling $420,449.77, less sums advanced, for the period from the disaffirmance of the lease on February 28, 1981 to Wards’ surrender of the premises.[2]
Wards removed the case to the Eastern District, and in October 1983, Farber amended his complaint, seeking for the first time use and occupancy payments from the date of Lafayette’s filing of the Chapter XI petition in January 1980. Far-ber’s amended claims sought: (1) $1,194,-642.87 ($68,006.24/month less amounts paid on account) for use and occupancy for all of 1980 and for January 1-June 17, 1981; (2) $245,900.77 less amounts paid on account for use and occupancy from June 18 to Wards’ surrender of the premises; (3) $139,226.40 for unpaid taxes; (4) $2,005.60 for unpaid insurance premiums; and (5) $350,000 for damages upon surrender of the premises, including failure to move “trade fixtures and other installations.”
Wards moved for partial summary judgment.[3] Judge Wexler granted the motion as to: (1) the first claim with respect to use and occupancy prior to 1981, and all claims for use and occupancy in excess of the lease amount from January 1,1981 to June 8, 1981; (2) the fourth claim; (3) the fifth claim with respect to failure to remove trade fixtures.
After a bench trial, Judge Wexler found with regard to Farber’s claim for use and occupancy during 1981 that the parties had agreed upon the rent and had not been concerned about the amount of space actually occupied by Lafayette. Specifically, he found that the $9,000/month rent payments made from January 1-June 17 had been agreed upon by the parties in exchange for Wards’ surrender of its renewal rights, and the $6,773/month rent payments made from June 18-October 31 had been agreed upon by the parties in the June 19 memorandum. Judge Wexler found with regard to Farber’s claim for taxes that Lafayette had occupied seventy percent of the building from January 1-June 17, 1981 and thirty percent of the building from June 18-October 31, 1981. *689 Prorating the total taxes due according to occupancy, Judge Wexler held that Lafayette owed Farber $68,933.97 in tax payments. Finally, Judge Wexler found that Farber was entitled to damages for removal of certain items in the building and repair of others, in the total amount of $72,-013.
The above findings resulted in an award to Farber of $85,946.37. On Farber’s motion pursuant to Fed.R.Civ.P. 59(e), the district court amended the judgment on October 2, 1986 to provide for the payment of interest, thereby increasing the award to $125,666.28. The March 1985 order granting partial summary judgment to Wards was entered as part of the amended judgment.
DISCUSSION
Both Farber and Wards appeal from the order and judgment below, raising issues relating to occupational rent, taxes, and damages connected with the surrender of the premises.
1. Occupational Rent
The first claim of Farber’s amended complaint sought an award for use and occupancy at the rate of approximately $68,-000/month for all of 1980 and for January 1-June 18, 1981. His second claim sought an award at a rate reduced according to Grumman Aerospace's partial occupancy during that period but still much higher than the lease rate. In granting partial summary judgment against Farber with respect to all claims for use and occupancy prior to 1981 and all claims for use and occupancy in excess of the lease rate from January 1-June 8,1981, Judge Wexler reasoned that the confirmation of Lafayette’s reorganization plan had discharged all debts arising before the June 8 order of confirmation. Moreover, even though the bankruptcy court had retained jurisdiction over adversary proceedings pending on June 8, Farber’s pending proceeding concerned only use and occupancy claims that arose in 1981 and were calculated by Far-ber himself at the lease rate.
With regard to the retroactivity issue, Farber argues that the rejection of Lafayette’s lease was a breach of the lease retroactive to the filing of Lafayette’s bankruptcy petition on January 4, 1980. See 11 U.S.C. § 365(g)(1) (1982). Farber had several opportunities prior to Lafayette’s discharge in bankruptcy, however, to assert a claim relating back to the 1980 period. Instead, he consistently sought an award for use and occupancy only for 1981. When the bankruptcy court permitted Far-ber to begin the instant proceeding, it granted him a specific and narrow exemption to litigate only this latter claim. We therefore agree with Judge Wexler that the confirmation of the reorganization plan bars Farber’s claim for use and occupancy before 1981.
Farber also argues that his amended complaint seeking retroactive use and occupancy payments was permitted under Fed.R.Civ.P. 15(c). Rule 16(c) governs the “relation back” of amended pleadings only for the purpose of the statute of limitations, which is simply not implicated in this case. His argument is therefore frivolous. Moreover, even if Farber’s amended claim for use and occupancy during the pre-1981 period did relate back to his original state court complaint, which was filed in December 1981, the claim would still be barred by the June 8, 1981 order confirming Lafayette’s reorganization plan as debts that arose prior to the date of discharge. 11 U.S.C. § 1141(d)(1)(A) (1982). See generally 5 Collier on Bankruptcy, 111141.01[4] (15th ed. 1979).
Farber fares no better on his claims for use and occupancy rates above the lease rate. Where, as here, a Chapter 11 debtor occupies property under a rejected lease, the debtor is liable only for the reasonable value of its use and occupancy of the property. See, e.g., In re J. Bain, Inc., 554 F.2d 255, 256 (5th Cir.1977); In re North Atl. & Gulf Steamship Co., 166 F.Supp. 29, 32 (S.D.N.Y.1958), aff'd sub nom, 120 Wall Assocs. v. Schilling, 266 F.2d 548 (2d Cir.1959). Absent contrary evidence, the prior lease rate is ordinarily presumed to be the proper measure of val *690 ue. See, e.g., In re William H. Herr, Inc., 61 B.R. 252, 254 (Bankr.E.D.Pa.1986); Diversified Serv., Inc. v. Harralson, 369 F.2d 93, 95 (5th Cir.1966). Unlike the landlord in S & W Holding Co. v. Kuriansky, 317 F.2d 666, 667-668 (2d Cir.1963), Farber did not make a timely attempt to show that the contractual rent was unreasonably low. Instead, he expressly alleged in his adversary proceeding in the bankruptcy court that the “reasonable value” for the premises was to be computed at the lease rate of $13,543.81 per month. The district court thus properly rejected Farber’s claims for amounts exceeding what he had sought prior to the discharge in bankruptcy.
Judge Wexler further limited Farber’s use and occupancy recovery for the 1981 period to rates below the lease rate. For the preconfirmation months of January-June 1981, Judge Wexler found that the parties had agreed to a rental rate of $9,000/month. For the postconfirmation months of July-October 1981, he found that the parties had agreed to a rental rate of $6,773/month. Farber challenges these findings.
A later agreement on a lower rent, of course, may prevail over the lease rate for purposes of determining occupational rent during the preconfirmation period. See Diversified Serv., 369 F.2d at 94-95 (bankruptcy referee allowed to consider parties’ agreement to make rental payments in amounts lower than lease rate). Because there is ample evidence that Lafayette surrendered its valuable renewal rights in exchange for Farber’s agreement to accept a monthly rental of $9,000 during the preconfirmation period, we affirm Judge Wexler’s findings.
The evidence is also ample with regard to his finding of an agreement on rent for the postconfirmation period. New York’s statutory provision for use and occupancy, which is similar to the use and occupancy concept in federal bankruptcy law, provides that “[t]he landlord may recover a reasonable compensation for the use and occupation of real property, by any person, under an agreement, not made by deed; and a parol lease or other agreement may be used as evidence of the amount to which he is entitled.” N.Y. Real Prop. Law § 220 (McKinney 1968). Evidence of such “other agreement” in this case consisted of extensive testimony about the parties’ negotiations during April and May 1981. As Farber’s counsel conceded in the district court, the parties had agreed upon an aggregate rental to be paid, and Judge Wexler’s finding that they were not concerned about Ward’s actual occupancy in the absence of new tenants is not clearly erroneous. The fact that the parties could not agree on other terms does not undercut Judge Wexler’s reliance upon the agreement as to aggregate rental as evidence of the value of use and occupancy. Cf. Genesee Management, Inc. v. Del Bello, 69 A.D.2d 987, 416 N.Y.S.2d 444 (App.Div.1979) (lease declared invalid under N.Y. Gen. Oblig. Law § 5-703 may be used as evidence of parties’ agreed rate of rental).
2. Taxes
For the purpose of calculating Wards’ tax liability, the district court found that Wards had occupied seventy percent of the building from January 1-June 17,1981, and thirty percent of the building from June 18-October 31, 1981. Applying these percentages pro rata to the total tax assessment for each period, the court held that Wards owed $68,933.97 in taxes.
In its cross-appeal, Wards argues, first, that because Farber was able to increase its revenue by leasing 96,296 square feet, or 53.75 percent of the space, to Grumman Aerospace, the award to Farber constitutes unjust enrichment. This argument is mer-itless. Because Grumman did not take possession until June 18, 1981, its occupation of the premises is irrelevant to a determination of the amount of use and occupancy payments Farber was entitled to collect during the preconfirmation period. After June 18, moreover, it was entirely proper for Farber to charge Grumman for 53.75 percent of the taxes and to charge Wards for an appropriate amount of the remaining 46.25 percent.
*691 Wards argues, second, that the assignment of a thirty percent rate for calculating taxes for June 18-October 31, 1981 was erroneous in light of the district court’s finding that the parties had agreed upon a lease for 14,353 square feet, or eight percent of the total space. Wards claims that the same eight percent figure should govern calculation of its share of taxes. We disagree. Farber’s acceptance of a smaller amount for aggregate rent than was justified by Wards’ actual occupancy does not necessarily mean that Far-ber also agreed to accept a smaller amount for taxes. Farber’s lack of intent to make any such agreement on taxes is clearly illustrated in a letter Farber sent to Lafayette on July 23, 1981, stating, “Since you presently occupy 30% of the above premises, your proportionate share of [the] tax bill amounts to $12,957.56.” The district court therefore did not err in determining Farber’s rent award based on express agreement and his tax award based on the percentage of space occupied.
3. Damages
In his fifth claim, Farber sought recovery under Article XXII of the lease for damage to the property and for failure to remove and repair trade fixtures and other installations. Article XXII states in relevant part:
On the last day of the term hereof or on the earlier termination thereof, Tenant shall ... surrender and deliver up to landlord the demised premises broom-clean, together with the building or any new building and all alterations, changes, additions and improvements which may have been made upon the premises (except furniture or trade fixtures, equipment and other installations put in at the expense of Tenant), in such state of repair and order and condition if the Tenant is required to maintain them during the term hereof except for reasonable wear and tear ... Tenant, on or before said date, shall remove all .of Tenant's personal property from the demised premises and all property not so removed shall be deemed to have been abandoned. ...
Judge Wexler concluded that although the lease had been rejected, the parties had entered into an implied contract concerning use and occupancy of the premises, and that, absent evidence to the contrary, it should be presumed that the terms of the implied contract mirrored those of the lease.[4] Judge Wexler granted partial summary judgment to Wards on the ground that removal of trade fixtures was not required under Article XXII. After trial, the court awarded Farber $72,013 for the costs of removing and repairing various items that were within Farber’s remaining claim.
Farber appeals from the dismissal of his trade fixtures claim. In granting partial summary judgment, Judge Wexler relied heavily on the fact that the lease contained no express requirement for removal of trade fixtures. He concluded that “[i]n the absence of an express covenant in the lease to the contrary, a tenant is not required to remove alterations he has made.” Memorandum and Order at 10 (citing Civic Realty Co. v. New York Tel. Co., 16 Misc.2d 660, 190 N.Y.S.2d 3 (Sup.Ct.1959)).
We believe this reliance on Civic Realty is misplaced. That case involved a tenant who made structural alterations on commercial premises so as to convert two separate rest rooms into one large rest room. The court held that because these alterations were made with the landlord’s knowledge and consent, there was no implied obligation that the tenant restore the premises to their original condition at the end of the lease term. 16 Misc.2d at 664, 190 N.Y.S.2d at 7. New York law distinguishes, however, between structural alterations of the type involved in Civic Realty and other, non-structural installations such as trade fixtures. See, e.g., N & S Decor Fixture Co. v. V.J. Enterprises, 57 A.D.2d 890, 394 N.Y.S.2d 278 (1977) (metal frame rack designed to support reels of wire was “a trade fixture and not an alteration” *692 because it was “capable of being removed without substantial injury to the premises and any damage so caused [could] be simply repaired.”) Moreover, the lease at issue here distinguishes between “alterations,” which must be surrendered to the landlord, and “trade fixtures,” which are exempt from the surrender requirement.
Under New York law, a tenant must remove trade fixtures at its own expense upon termination of the lease. See Malloy v. Club Marakesh, Inc., 71 A.D.2d 614, 615, 418 N.Y.S.2d 135, 137 (1979); 1 J. Rasch, Landlord & Tenant § 511 (Supp. 1987). Because Judge Wexler concluded otherwise when he dismissed Farber’s trade fixtures claim, he made no findings with respect to whether the items at issue—various partitions in the retail, computer, and executive office areas[5]—were trade fixtures or alterations. Cf. Century Holding Co. v. Pathe Exch. Inc., 200 A.D. 62, 192 N.Y.S. 380 (1922) (holding that partitions were “movable office furniture” under lease); Bigalke & Eckert Co. v. William Knabe & Co. Manufacturing Co., 65 Misc. 29, 119 N.Y.S. 1114 (1909) (per cu-riam) (holding that partitions were erected in such a manner so as not to fall within lease provision relating to “movable office furniture”). We therefore reverse the judgment of the district court insofar as it granted summary judgment to Wards on the trade fixtures claim and remand for further proceedings.
In its cross-appeal, Wards asserts that the district court should have either dismissed the damage claims in their entirety as barred by the discharge in bankruptcy, 11 U.S.C. § 1141 (1982 & Supp. Ill 1985), or allowed them at only twelve percent as general unsecured claims against the bankrupt estate. We disagree. Under Wards’ theory, Farber would have been required to file a claim based upon anticipatory breach prior to confirmation of Lafayette’s reorganization plan on June 8, 1981. Farber knew that Wards wanted to remain in possession of the premises and, in fact, negotiated with Wards during April and May 1981 over the terms of a new lease. We cannot agree that Farber should have anticipated then that Wards might neglect to remove or repair particular items when it surrendered possession on some uncertain date in the future. Had the parties agreed on a lease, for example, six years might have passed before Wards surrendered possession because the proposed leases contemplated a term of three years with an open three-year renewal option. Farber’s claims did not arise upon rejection of the lease, see 11 U.S.C. § 502(g) (1982), but upon Wards’ surrender of the premises. The district court therefore properly rejected Wards’ arguments and treated the obligations of the tenant under Article XXII as the obligations of Wards as successor in interest.
CONCLUSION
We affirm the judgment of the district court in all respects except insofar as it granted summary judgment against Farber on his claim for removal of trade fixtures. We reverse the judgment as to the trade fixtures claim and remand for further proceedings consistent with this opinion.

. Farber had filled out and signed the claim on May 8, 1981, but waited nearly three months to file it.

. Although Farber initially sought use and occupancy through November 30, 1981, he does not challenge the district court’s finding that Wards terminated possession on October 31, 1981.

.Wards also asserted a counterclaim for breach of a promise to enter into a new lease for a portion of the premises. On December 13, 1983, the district court dismissed this counterclaim.

. Judge Wexler noted that Farber’s damages claim should have been directed to the conduct of Wards instead of Lafayette and should not have been based upon the lease per se, but concluded that these technical defects in form would not destroy Farber’s claim.

. Judge Wexler did not identify the property that was covered by his summary judgment determination. However, his subsequent denial of recovery for removal of any of the partitions, see Memorandum and Opinion at 10-12, was apparently based on the dismissal of the trade fixtures claim.