# TOWN OF NEW HARTFORD ET AL. *v.* CONNECTICUT RESOURCES RECOVERY AUTHORITY ET AL.
## (SC 17946)
## (SC 18109)

Rogers, C. J., and DiPentima, McLachlan, Gruendel and Robinson, Js.*

---

* The listing of justices reflects their status on this court as of the date of oral argument.

434

Argued October 16, 2008—officially released May 19, 2009

*Louis R. Pepe*, with whom were *Richard F. Wareing*, *Richard H. Goldstein, Daniel J. Klau, Joseph J. Cham-*

*bers* and, on the brief, *David W. Case* and *James G. Green, Jr.*, for the appellant (named defendant).

*David S. Golub*, with whom were *Jonathan M. Levine, Joseph V. Meaney, Jr.*, and, on the brief, *Marilyn J. Ramos* and *Craig N. Yankwitt*, for the appellees (plaintiffs).

*Opinion*

ROGERS, C. J. The named defendant, Connecticut Resources Recovery Authority,[1] in two separate appeals,[2] challenges the judgment of the trial court awarding a constructive trust in favor of the plaintiffs[3]

---

[1] In addition to the named defendant, this action initially was brought against James F. Abromaitis, Mark T. Anastasi, Richard O. Belden, John C. Chapin, Jr., Kathleen Collins, Gary F. Flynn, Frederick Lisman, Alphonse S. Marotta, Frank N. Nicastro, Michele Parrotta, Louis L. Rubenstein, Marc S. Ryan, Bernard Schilberg, Edward B. St. John, James F. Sullivan, Theodore T. Tansi, Louis Timolat, Peter B. Webster, Lennie T. Winkler, John G. Rowland, Peter E. Ellef, Robert E. Wright, Michael J. Martone, William S. Tomasso, Tomasso Group, the Republican Governors Association, the Republican National State Election Committee, Anthony W. Ravosa, Steven Montovanno, Jeffrey Ader, Daniel Allegretti, Kenneth L. Lay, Jeffrey K. Skilling, Andrew S. Fastow, Michael J. Kopper, Richard A. Causey, James V. Derrick, J.P. Morgan Chase and Company, Citigroup, Inc., Credit Suisse First Boston, Canadian Imperial Bank of Commerce, Bank of America Corporation, Merrill Lynch and Company, Inc., Barclay's, PLC and Lehman Brothers Holding, Inc. The claims against all of the defendants except the named defendant either were withdrawn or dismissed prior to trial. In this opinion we refer to the named defendant alone as the defendant.

[2] This opinion addresses two of five appeals filed by the defendant over the course of the underlying proceedings. The other three appeals are addressed in separate opinions released on the same date as this opinion. See *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 489, 970 A.2d 570 (2009); *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 502, 970 A.2d 578 (2009); *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 511, 970 A.2d 583 (2009).

[3] The plaintiffs are a class comprised of seventy Connecticut municipalities: Avon; Barkhamsted; Beacon Falls; Bethlehem; Bloomfield; Bolton; Canaan; Canton; Chester; Clinton; Colebrook; Cornwall; Coventry; Cromwell; Deep River; Durham; East Granby; East Hampton; East Hartford; East Windsor; Ellington; Enfield; Essex; Farmington; Glastonbury; Goshen; Granby; Guilford; Haddam; Harwinton; Hebron; Killingworth; Litchfield; Lyme; Madison; Manchester; Marlborough; Middlebury; Middlefield; Naugatuck; New Hartford; Newington; Norfolk; North Branford; North Canaan; Old Lyme; Old Saybrook; Oxford; Portland; Rocky Hill; Rox-

after finding that the defendant had been unjustly enriched by its retention of certain lawsuit settlement proceeds,[4] and certain postjudgment orders. In the first appeal, SC 17946, the defendant claims that the trial court improperly: (1) rendered judgment for the plaintiffs on a theory of unjust enrichment in light of the existence of express contracts between the parties and the defendant's willingness to rebate a portion of the settlement proceeds; (2) imposed a constructive trust because the plaintiffs' unjust enrichment theory was not cognizable as a matter of law and their interest in an identifiable res was lacking; and (3) certified the plaintiffs as a class because the numerosity criterion of Practice Book § 9-7[5] was unsatisfied.[6] In the second appeal, SC 18109, the defendant challenges certain post-

bury; Salisbury; Sharon; Simsbury; South Windsor; Southbury; Suffield; Thomaston; Tolland; Torrington; Vernon; Waterbury; Watertown; West Hartford; Westbrook; Wethersfield; Winchester; Windsor Locks; and Woodbury. This matter was certified as a class action on March 21, 2006, after the trial court found that the named plaintiff, the town of New Hartford, had shown that the prerequisites of Practice Book §§ 9-7 and 9-8 were satisfied.

[4] The trial court, alternatively, awarded the constructive trust to the plaintiffs as restitution for the defendant's breach of its contracts with the plaintiffs.

[5] Practice Book § 9-7 provides: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Additionally, before certifying a class action, the trial court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Practice Book § 9-8.

[6] The defendant argues additionally, for a variety of reasons, that the trial court improperly found that it had breached its contracts with the plaintiffs. Because we conclude herein that the court properly found unjust enrichment and that finding provides an independent basis for the court's award of a constructive trust, we need not reach the defendant's arguments pertaining to breach of contract. See *Laser Contracting, LLC* v. *Torrance Family Ltd. Partnership*, 108 Conn. App. 222, 229, 947 A.2d 989 (2008) (unnecessary to address merits of contract claim when judgment can be sustained on ground of unjust enrichment).

judgment orders of the trial court. It argues that the court improperly ordered it to adjust its budget and to reduce fees to the plaintiffs for the pending fiscal year because the court's order: (1) was issued in response to an improperly amended complaint alleging a new cause of action that required an additional hearing; and (2) was based on a clearly erroneous factual finding. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to the appeals. The defendant is a quasi-public entity established by statute in 1973 to implement Connecticut's solid waste management plan and to assist Connecticut municipalities in managing, recycling and disposing of their solid waste. See General Statutes § 22a-261 et seq. The defendant operates four separate, geographically based solid waste disposal "projects," each financially independent of the others and servicing a distinct group of municipalities. The plaintiffs are the municipalities serviced by the Mid-Connecticut Project (project), which generally covers the center and northwest portions of the state.

When the project was formed in the early 1980s, a processing facility was constructed on certain property in the South Meadows section of the city of Hartford. The construction was financed through the issuance of $309 million of tax-exempt bonds.[7] Pursuant to the bond agreements, it was necessary for the defendant to enter into long-term contracts with the plaintiffs to ensure an adequate supply of waste and, by extension, project revenue. Accordingly, each plaintiff, in or around 1985, entered into a contract with the defendant that will not terminate until 2012, when the project as it currently exists is scheduled to conclude.

---

[7] In 1996, the defendant defeased; see footnote 14 of this opinion; the bonds remaining from the original bond issuance, then issued a new series of bonds having a principal balance of $209 million, pledging project revenues as security.

Pursuant to the parties' contracts, the plaintiffs agreed to process all of their solid waste at the defendant's facility and pledged their full faith and credit to ensure payment of the amounts that they owed to the defendant under the contracts. The amounts owed are based on the project's "net cost of operation," which is computed by deducting the project's revenues from its operating expenses, including the principal and interest due on the facility construction bonds, for each fiscal year[8] of the parties' contractual relationships. Specifically, each plaintiff pays a "tip fee" for each ton of waste it delivers to the defendant. The plaintiffs provide 45 percent of the project's waste and, hence, tip fee revenue, while the remaining 55 percent is provided by private waste haulers who are not parties to this action.[9] The tip fee is determined by dividing the project's net cost of operation by the total cumulative tonnage of waste processed at the facility. Because the net cost of operation must be computed prior to the commencement of a given fiscal year, it necessarily is determined on the basis of estimated figures. To the extent the estimates are too high, resulting in surplus revenues at the end of the fiscal year, those revenues must be applied to offset the net cost of operation in the budget for a subsequent year.[10]

---

[8] The project's fiscal year begins on July 1 and ends on June 30.

[9] The private haulers apparently pay the same tip fee as the plaintiffs.

[10] The trial court summarized the relevant terms of the parties' contracts as follows:

"a. The [plaintiffs] are obligated to process all of their [waste] at project facilities and guarantee delivery of certain minimum amounts of [waste] each year.

"b. The [plaintiffs] are required to pay the project's 'net cost of operation'— i.e., that portion of the project's annual operating expenses (including principal and interest on the project's bonds) that is not covered by [the defendant's] sales of steam or electricity or other sources of revenue. [The defendant] is obligated to use all revenues received by the project to defray the project's expenses and must include those revenues in the calculation of the project's net cost of operation. The contracts define 'revenues' as proceeds received from the sale or other disposition of recovered products and receipts from other than [the plaintiffs]. 'Recovered products' are defined

Also in 1985, the defendant entered a long-term energy purchase agreement with Connecticut Light and Power (power company), to expire in 2012, pursuant to which the power company would purchase, at above market rates, electricity generating steam produced by the burning of solid waste at the South Meadows facility. The revenues produced by the energy purchase agreement were a major offset to the expenses of the project, lowering substantially the net cost of operation and, accordingly, the tip fee paid by the plaintiffs.

By the mid-1990s, the project was operating very efficiently, leading to both decreasing tip fees and multimillion dollar operating surpluses. The defendant,

as materials or substances including energy which result from the processing of solid waste in the system.

"c. [The defendant] is required to establish an annual budget for the project each year, based on anticipated expenses and revenues. [The defendant] is required to annually adjust the rate per ton of garbage processed (i.e., the tip fee) paid by the [plaintiffs] so that the [plaintiffs'] aggregate payments—referred to in their contracts as 'service payments'—will be sufficient to pay the project's net cost of operation.

"d. [The defendant] is obligated to reconcile each year's projected budget against actual operating results and to credit any surplus (or debit any deficit) to succeeding years budgets. The projected budgets must, under the contracts, be announced for an upcoming fiscal year (beginning July 1) by March 1 of the prior fiscal year. Thus, any surplus/deficit reconciliation at fiscal year-end must, as a practical matter, be applied to the budget two years out.

"e. [The defendant] and the [plaintiffs] are required to comply with all applicable laws.

"f. The [plaintiffs] pledge their full faith and credit to secure their payment obligations under the contract[s] and are required to use their taxing power, if necessary, to make any payments owing under the contracts.

"g. Both [the defendant] and each [plaintiff] have the right to sue to enforce the contract. The contracts contain a provision prohibiting the [plaintiffs'] right to recover damages from [the defendant], but do not otherwise limit the [plaintiffs'] right to legal and equitable remedies.

"h. The [plaintiffs] shall not acquire any vested or ownership rights in the system by reason of [the] contract[s]; provided, however, that in the event of a disposition of public property, [each plaintiff] shall receive a payment or payments as determined by [the defendant] consistent with [that plaintiff's] interest therein, if any."

however, failed to credit those surpluses to the budget in subsequent years as required by the parties' contracts. At trial, the defendant admitted that from fiscal year 1997 through fiscal year 2004, it improperly failed to credit approximately $25,600,000 in project operating surpluses, making tip fees higher than they otherwise would have been.

By the late 1990s, the defendant's energy purchase agreement with the power company had become very lucrative due to a low market price for steam, producing more than $20 million annually for the project in above market rate revenues. In 1998, the General Assembly enacted the Electric Restructuring Act, Public Acts 1998, No. 98-28 (P.A. 98-28), which, inter alia, required the power company to make good faith efforts to divest itself of above market contracts such as the energy purchase agreement with the defendant and provided subsidized loans for that purpose. Ultimately, the defendant accepted $280 million from the power company, referred to as a buy down, to release the power company from the energy purchase agreement. See P.A. 98-28, § 8 (c) (1) (B).

The defendant wanted to find a use for the buy down proceeds that would offset the loss of the annual revenue that it had previously received pursuant to the energy purchase agreement. Because those proceeds represented an advance payment of what otherwise would have been future project revenues, the only proper use for them was in connection with the project. Moreover, the defendant's authority to enter into loan transactions and to make investments was restricted by its enabling legislation,[11] and federal arbitrage laws prevented it from lending the buy down proceeds at a

[11] See General Statutes § 22a-265 (14) (delineating defendant's investment authority); General Statutes § 22a-267 (5) (outlining defendant's lending authority).

rate greater than the tax-exempt yield on the project's bonds.

Despite the foregoing restrictions on the use of the buy down proceeds, the defendant, in March or April of 2001, used $220 million of those proceeds to make what it since has admitted was an illegal, ultra vires unsecured loan to Enron Power Marketing, Inc., a subsidiary of Enron Corporation (collectively Enron).[12]

---

[12] The loan was structured to look like a multiparty energy transaction, that also involved the power company. The trial court described it as follows: "The transaction was a loan disguised to be an energy transaction. In addition to monthly principal and interest payments, Enron agreed, on paper, to purchase electricity from [the defendant] for resale to [the power company]. The energy component of the transaction was wholly illusory: [the defendant] generated electricity, sold the electricity to Enron at the buy down rate, and Enron immediately resold it to [the power company] at the same rate. For each right or obligation of Enron, there is an offsetting right of [the power company] or [the defendant] such that Enron had no material participation or commodity risk in the energy aspects of the restructuring. Only [the defendant] and [the power company] truly participated in and had commodity risk in the energy aspect of the restructuring.

"The net effect of the Enron transaction documents was that Enron . . . was to receive [more than $220] million of buy down proceeds (from [the power company]), and agreed to make fixed monthly payments to [the defendant] totaling [$2.375 million per month] for [eleven and one-half] years ($2.2 [million per month for] a so-called steam capacity charge and [more than $175,000] for so-called operating and maintenance charges). These payments were required, on the first day of each month, irrespective of whether [Enron] received any steam or electricity from [the defendant]. The amount of Enron's fixed payments was to be adjusted, based on the actual date of the buy down proceeds being received by [Enron] so that the payments provided [the defendant] with precisely a 7.38 percent return on the buy down proceeds received by [Enron]. [Enron's] energy obligations were illusory. Whatever steam [Enron] purchased from [the defendant] was instantaneously returned to [the defendant] at no cost. Whatever electricity [Enron] purchased from [the defendant] was instantaneously sold to [the power company] at precisely the same price [Enron] paid [to the defendant]. [The power company] was billed by [the defendant] for the electricity sold to [Enron], and [the power company's] payments to [Enron] were immediately paid over to [the defendant]. [The power company], in fact, purchased all of the electricity generated by [the defendant's facility] and paid [the defendant] either directly or through [Enron], for the electricity at the reduced buy down prices agreed to in March, 1999."

Contemporaneous with the loan transaction, two law firms, Murtha Cullina, LLP (Murtha), and Hawkins Delafield and Wood, LLP (Hawkins), advised the defendant that it was legal and not violative of the defendant's bonding agreements. As to the other $60 million of the buy down proceeds, the defendant used $10 million to purchase the South Meadows property and equipment from the power company and approximately $26.7 million for environmental remediation of the South Meadow property. The approximately $23 million remaining, along with the property and equipment purchased from the power company, was placed in a ventures account that was not associated with the project (nonproject ventures account). Representatives of the defendant testified at trial, and the trial court found, that the diversion of the purchased assets and remaining buy down proceeds into the nonproject ventures account was improper and that those items instead should have been placed in project accounts.[13]

When the defendant received and disbursed the buy down proceeds, the project's debt service on the remaining construction bonds was approximately $26 million annually. The defendant, at that time, could have used $202,724,437 of the buy down proceeds to defease all of the remaining bond obligations and to eliminate that annual expense for the life of the project.[14]

[13] In the project's fiscal year 2003, the defendant's board of directors ordered the defendant to consolidate the nonproject ventures account with project assets, but did not direct the defendant to compensate the project for the effects of the diversion on past or future project budgets.

[14] As the trial court explained, defeasance is "a process in which bonds are purchased from the government in order to pay off existing bonds with the same maturity dates . . . ." Defeasance "involves the purchase of government securities that mature on dates that coincide with the dates that the subject bonds mature or otherwise can be redeemed (paid) and that earn interest covering the payment obligations on the bonds until the maturity or call date." A defeasance program established by the federal government in the 1970s provides "a risk free mechanism to enable state and local governmental entities to establish escrow portfolios to secure the payoff of bonds that are not yet redeemable. The practice of defeasance

Pursuant to the terms of the illegal loan, Enron was to make fixed monthly payments to the defendant of $2.375 million per month for eleven and one-half years. Of each payment, $175,000 was to be diverted to the nonproject ventures account. Enron made eight of the required monthly payments, from April, 2001, through November, 2001, then ceased making any further payments to the defendant. In December, 2001, Enron filed for bankruptcy. The loss of payments from Enron caused the project to sustain an annual revenue loss of $28.5 million, bringing it to the brink of financial ruin.

Initially, the revenue shortfalls were covered by increased tip fees[15] and use of project surpluses and overfunded reserves. Between fiscal year 2002 and fiscal year 2007, tip fees increased over 35 percent, from $51 per ton to $69 per ton, even though the project's annual expenses during this period were decreasing. The total additional tip fee charges over that time period amounted to $64.185 million. The plaintiffs' 45 percent share of that total, versus that of the private haulers who use the defendant's facilities, is $28,883,250. More than $38 million in surpluses and reserves were dissipated. The 45 percent share of the dissipated reserves attributable to the plaintiffs' past tip fee payments is $17,356,242. An additional $15,534,405 was transferred back to the project from the nonproject ventures account and was used to defray expenses; the plaintiffs' 45 percent share of the transfer is $6,990,482. Subsequently, pursuant to legislation enacted by the General Assembly to address the impact of the Enron failure, the defendant borrowed approximately $20 million from the state and its entire board of directors was

has been well established in the field of public finance for years, and the public finance section of any major investment banking firm provides defeasance services."

[15] The increase in project tip fees following the collapse of the Enron transaction was substantial—46 percent of the lost revenue attributable to Enron's default was covered by tip fee increases.

replaced. The costs of borrowing were borne by the project.

The defendant's out-of-pocket loss from the failure of the Enron transaction was at least $201 million. Over time, however, the defendant was able to recover a sizable portion of that loss through litigation[16] and resale of energy. In February, 2005, after successfully pursuing a claim against Enron in bankruptcy court, the defendant sold that claim for $111.7 million. In 2006, the defendant received $2.95 million in settlement with three law firms that had represented Enron and, the defendant claimed, had assisted Enron in perpetrating fraud.[17] The defendant also filed malpractice actions against Murtha and Hawkins for their advice regarding the use of the buy down proceeds, and, while the present action was pending, it settled those claims for $16.25 million and $21 million, respectively. When the trial court rendered its judgment, the defendant was continuing to pursue claims against other parties that had been involved in the Enron transaction. Additionally, after being released from its obligations to Enron, the defendant was able to remarket 250 million kilowatt hours of power annually at higher prices. The trial court found that in fiscal years 2004 through 2007, the defendant received $15 million more in revenue than it would have received from Enron, and that in fiscal years 2008 through 2012, the defendant was projected to receive an additional $30.5 million.

The defendant did not use any of the foregoing receipts to provide direct reimbursement to the plaintiffs for the increased tip fees that they had paid. From

---

[16] The project has borne the approximately $6 million in costs that the defendant has incurred in litigation against third parties. Additionally, a $150,000 arbitrage fine, levied on the defendant by the federal government as a penalty for the illegal loan to Enron, was included in project expenses.

[17] We refer to Murtha and Hawkins individually by name and collectively, along with the law firms that had represented Enron, as the law firms.

the funds received for the sale of the Enron bankruptcy claim, the defendant used $91 million to partially defease project bonds and approximately $19 million to repay the loan from the state; none was rebated to the plaintiffs or used to restore the surpluses or overfunded reserves that had been depleted in the wake of Enron's failure.

The named plaintiff filed this action on January 23, 2004, and thereafter, the trial court certified it as a class action. See footnote 3 of this opinion. In an amended revised complaint dated October 20, 2006, the plaintiffs asserted claims against the defendant[18] for breach of contract, breach of fiduciary duty, breach of the duty of good faith and fair dealing and unjust enrichment. As bases for each of these claims, the plaintiffs alleged facts pertaining to the defendant's failure to credit operating surpluses in past project budgets, its wrongful consummation of the illegal Enron transaction, its diversion of buy down proceeds and assets purchased with those proceeds into the nonproject venture account, its past and continuing imposition of the costs flowing from the failure of the Enron transaction on the plaintiffs through the use of reserves and increased tip fees and its failure to reimburse the plaintiffs for the additional costs imposed. In their prayer for relief, the plaintiffs requested, inter alia, a judicial determination that the defendant may not impose losses related to the Enron transaction on the plaintiffs, a permanent injunction preventing the defendant from doing so and directing it to make restitution for the past imposition of such losses, and orders imposing a constructive trust

---

[18] The plaintiffs alleged additional counts against individuals who were members of the defendant's board of directors at the time of the Enron transaction. The action as to those individuals ultimately was dismissed for lack of standing. Although the plaintiffs appealed from that dismissal, they subsequently withdrew the appeal. The plaintiffs' appeal from the dismissal of this action as against certain state government officials, also for lack of standing, similarly has been withdrawn.

over assets in the defendant's possession that in equity should belong to the plaintiffs. The defendant in its answer denied each count and raised a number of special defenses, among them that a limitation of remedies provision in the parties' contracts barred the plaintiffs from recovering monetary relief for their claims.

A trial to the court was held on diverse dates in November, 2006, through January, 2007. On June 19, 2007, the trial court issued a comprehensive memorandum of decision wherein it ruled in favor of the plaintiffs on their claim of unjust enrichment.[19] As a restitutionary remedy for the defendant's unjust enrichment at the plaintiffs' expense, the court ordered the imposition of a constructive trust in the amount of $35,873,732 over proceeds that the defendant had received in settlement of lawsuits against the law firms involved in the Enron transaction. That amount represented the $28,883,250 of increased tip fees that the defendant had charged the plaintiffs for fiscal years 2002 through 2007, plus $6,990,482, the plaintiffs' share of the moneys improperly diverted to the nonproject ventures account but subsequently used to defray the shortfall stemming from the Enron transaction.[20] The court rejected the

[19] As noted previously in this opinion, the court also found for the plaintiffs on their breach of contract claim. Specifically, the court held that the defendant had breached the parties' contracts by violating applicable laws in conjunction with the Enron transaction, failing to credit past project surpluses to budgets in succeeding years and failing to calculate properly the project's net cost of operation.

The court ruled in favor of the defendant on the plaintiffs' claim of breach of fiduciary duty after concluding that the circumstances surrounding the parties' contractual relationship did not give rise to such a duty. It further rejected the plaintiffs' claim that the defendant had violated a duty of good faith and fair dealing after finding that there was no evidence that the defendant had acted in a fraudulent manner or with a dishonest purpose.

[20] According to the trial court, "[t]hese moneys should have been in the [project accounts] at all times, and should have been used to benefit the project. If these funds were properly used, the original tip fees for the years in question would have been lower. This fact was acknowledged by [the defendant] when it consolidated the nonproject ventures account with the [project accounts] in [fiscal year 2003]." See footnote 13 of this opinion.

defendant's argument that the parties' contracts precluded the imposition of the constructive trust, reasoning that the award was neither inconsistent with any express provision of those contracts, nor contrary to the limitation of remedies provision.

In determining that the defendant would be unjustly enriched by the retention of the settlement proceeds, the trial court reasoned that the impact of the annual revenue shortfalls resulting from the failure of the Enron transaction had been borne entirely by the plaintiffs and the private haulers who used the defendant's project facilities. Citing the testimony of the defendant's president, Thomas Kirk, the court noted that the defendant itself, as a corporate entity, had not sustained any financial loss. The court found that the defendant had avoided loss by increasing annual tip fees, using improperly retained project surpluses and overfunded reserves, and burdening the project with the costs that the defendant had incurred in borrowing from the state and pursuing litigation against third parties. The court observed that as of the date of the decision, the defendant had recovered more than $150 million from claims made and litigation arising from the Enron transaction and expected to recover millions more, but had not returned anything directly to the plaintiffs. The trial court acknowledged that the defendant had used $110 million of those funds to defease bonds and to repay the state loan, but noted that it currently was holding approximately $37.6 million from the more recently received recoveries. The court found that at present, the defendant's financial position had stabilized. In particular, the project's bonds were substantially defeased, the defendant was holding sufficient funds to complete the defeasance within the year and a recent project audit had disclosed that project reserves were adequately funded. Accordingly, the court held that it would be both unjust and inequitable to allow the defendant

to retain the additional litigation recoveries. The court also concluded that the plaintiffs had proven that the defendant had benefited by holding those recoveries, which were awarded to compensate it for increased costs and losses resulting from the Enron failure; that the defendant did not pay the plaintiffs for those benefits, even though the plaintiffs had borne the resultant costs and losses; and that the defendant's failure to make payment was to the plaintiffs' detriment.

The trial court rejected as "strain[ing] credulity" the defendant's argument that it was not unjustly enriched at the plaintiffs' expense because all settlement funds were used for the plaintiffs' benefit. The court noted that Kirk and the chairman of the defendant's board of directors (board), when testifying, both had refused to commit to returning the full lawsuit proceeds to the plaintiffs, although the evidence showed that the defendant already had adequate reserves and funding for defeasement. The court also cited testimony from the board chairman and the defendant's chief financial officer that the defendant intended to use some of the lawsuit recoveries for purposes that extended beyond the period of the parties' current contractual relationship.

The trial court further concluded that the settlement funds constituted an identifiable res,[21] directly traceable to the losses sustained by the plaintiffs, because they were obtained through claims and lawsuits[22] brought to recoup those same losses. It noted Kirk's testimony that all of the defendant's efforts to recover money through litigation were traceable to the project's deal with Enron. Moreover, the actions against the law firms specifically referenced the increased tip fees to the

[21] Pursuant to an earlier order of the court, the settlement funds were being held by the state treasurer pending resolution of the plaintiffs' claims.

[22] The court had taken judicial notice of the court files for the actions brought by the defendant against the law firms.

plaintiffs and the nonproject ventures account. The court held that, because the lawsuit recoveries represented an identifiable res directly traceable to the Enron transaction, and the losses flowing from that transaction had been borne by the plaintiffs, the majority of those moneys, in good conscience, should be used as restitution to the plaintiffs.[23]

Finally, the trial court issued an injunction against the defendant, "prohibiting it from imposing any of the costs of the Enron transaction on the [plaintiffs], commencing with the [fiscal year 2008] budget and relating to all budget years through the contract [termination] year of 2012 between [the defendant] and the [plaintiffs]. The issuance of the injunction will prevent further unjust enrichment on the part of [the defendant] at the expense of the [plaintiffs]." These appeals followed. Additional facts and procedural history will be provided where necessary.

I

THE FIRST APPEAL

(SC 17946)

A

Unjust Enrichment

The defendant claims first that the trial court improperly found in favor of the plaintiffs on the theory of

---

[23] The plaintiffs had requested relief of a much broader scope, namely, a constructive trust over various assets of the defendant totaling $104,497,441. The trial court declined, however, to impose the constructive trust on any additional moneys in the defendant's control. It reasoned that, although the defendant improperly had failed to credit prior fiscal years surpluses in subsequent project budgets, the wrongfully retained funds eventually were used in an effort to save the defendant, which ultimately benefited the plaintiffs by lowering tip fees. Moreover, any identifiable res connected to those moneys had been dissipated. Finally, the court considered that any further imposition of the constructive trust on the defendant's surplus funds, which were held for legitimate business purposes, could impede the defendant's daily operations. The defendant, therefore, would not be unjustly enriched if permitted to retain those funds.

unjust enrichment. It argues that the plaintiffs could not recover on that theory because express contracts between the parties govern the subject matter of this dispute. Moreover, the defendant claims, because its board voted to rebate a portion of the settlement funds to the plaintiffs but was prevented from doing so by the trial court, it cannot be held to have wrongfully retained those funds. We disagree with each of these claims.

We begin with an overview of general principles. "[W]herever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract, restitution of the value of what has been given must be allowed." 26 S. Williston, Contracts (4th Ed. 2003) § 68:4, p. 57. Under such circumstances, "the basis of the plaintiff's recovery is the unjust enrichment of the defendant." Id., § 68:5, p. 58. "A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that

The trial court found the use of the nonproject venture account funds distinguishable from the dissipation of the other reserves and surpluses in that the defendant had "sued the law firms claiming the losses of both the nonproject ventures account funds and the increased tipping fees to the [plaintiffs]. The lawsuit itself constituted the identifiable res [from] which any proceeds . . . are subject to the imposition of a constructive trust . . . ."

the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." (Citations omitted; internal quotation marks omitted.) *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.*, 231 Conn. 276, 282–83, 649 A.2d 518 (1994).

"This doctrine is based upon the principle that one should not be permitted unjustly to enrich himself at the expense of another but should be required to make restitution of or for property received, retained or appropriated. . . . The question is: Did [the party liable], to the detriment of someone else, obtain something of value to which [the party liable] was not entitled?" (Citations omitted.) *Franks* v. *Lockwood*, 146 Conn. 273, 278, 150 A.2d 215 (1959).

Our review of the trial court's conclusion that the defendant was unjustly enriched is deferential. The court's "determinations of whether a particular failure to pay was unjust and whether the defendant was benefited are essentially factual findings . . . that are subject only to a limited scope of review on appeal. . . . Those findings must stand, therefore, unless they are clearly erroneous or involve an abuse of discretion. . . . This limited scope of review is consistent with the general proposition that equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court." (Citations omitted.) *Hartford Whalers Hockey Club* v. *Uniroyal Goodrich Tire Co.*, supra, 231 Conn. 283.

1

The defendant claims first that the trial court improperly permitted the plaintiffs to recover on the theory of unjust enrichment because express contracts between the parties govern the subject matter of this dispute. It argues specifically that this action basically

concerns the proper calculation of tip fees, a topic addressed by provisions of the parties' contracts. Furthermore, according to the defendant, a limitation of remedies clause in the contracts applies to preclude the restitutionary relief afforded the plaintiffs. We do not agree.[24]

We will address the defendant's two arguments in turn. As to the first argument, the following additional facts and procedural history are pertinent. In finding for the plaintiffs on their unjust enrichment claim, the trial court disagreed that this claim should be barred because it conflicts with § 401 of the parties' contracts, which governs the calculation of tip fees and directs that they reflect the project's net cost of operation. The court reasoned: "The claim for unjust enrichment, contrary to [the defendant's] contention, is not specifically about the proper tip fees that should have been charged. [The defendant's] argument views the case from the plaintiffs' perspective as if this were a case

---

[24] The defendant also asserts, in cursory fashion, that the plaintiffs' unjust enrichment claim is barred by § 401 of the parties' contracts, which requires that tip fees reflect the project's net cost of operation, read in conjunction with § 101 of the contracts, which defines net cost of operation as the cost of operation less "[r]evenues," which in turn are defined as "proceeds received from the sale or other disposition of [recyclables or energy] and receipts from other than [the plaintiffs]." According to the defendant, the definition of revenues encompasses the settlement proceeds, requiring them to be factored into the net cost of operation, and, therefore, "the disposition of the settlement proceeds was a subject 'dealt with' by the [contracts], barring any claim for unjust enrichment." We disagree with the defendant's strained construction of the term "revenue" and instead, consistent with the contract definition, afford that term its ordinary meaning of "income," i.e., "a gain or recurrent benefit . . . *that derives from capital or labor . . . .*" (Emphasis added.) Merriam-Webster's Collegiate Dictionary (10th Ed. 1993); see also D. Scott, Wall Street Words: An Essential A to Z for Today's Investor (1997) (defining revenue as "[t]he inflow of assets that results from *sales of goods and services* and earnings from dividends, interest and rent" [emphasis added]). Accordingly, we conclude that the plaintiffs' unjust enrichment claim is not barred because § 401 does not direct a particular disposition for the settlement proceeds.

for money damages. This particular count, however, must be viewed from the perspective of [the defendant] in order to determine if [it is] holding any moneys which, in good conscience, should be returned to the plaintiffs. The claim is not barred as a matter of law."

The defendant takes issue with the foregoing determination. It argues that the plaintiffs' claims and the trial court's findings make clear that the present dispute is all about what the tip fees should have been, a subject contemplated by the parties' express contracts. According to the defendant, "the [plaintiffs] alleged and argued at trial, and the trial court concluded, that [the defendant] was unjustly enriched by charging tip fees set to cover a portion of the revenue shortfall caused by Enron's default." As we explained previously in this opinion, the amount of the trial court's award was based, in part, on the increase to the plaintiffs' tip fees in the wake of the failure of the Enron transaction. The plaintiffs argue in response that the parties' contracts do not bar their recovery in unjust enrichment because no provision of those contracts addresses what should occur when the defendant recovers a settlement reimbursing losses previously borne by the plaintiffs through higher tip fees. We agree with the plaintiffs.

"It is often said that an express contract between the parties precludes recognition of an implied-in-law contract[25] governing the same subject matter." (Internal

---

[25] "[A]n implied in law contract is not a contract, but an obligation which the law creates out of the circumstances present, even though a party did not assume the obligation . . . . It is based on equitable principles to operate whenever justice requires compensation to be made. . . . An implied in law contract may arise due to one party being unjustly enriched to the detriment of the other party. . . . Accordingly, an implied in law contract is another name for a claim for unjust enrichment. See *Meaney* v. *Connecticut Hospital Assn., Inc.*, 250 Conn. 500, 511, 735 A.2d 813 (1999) (observing that claim for unjust enrichment is sometimes denominated implied in law claim or quasi-contract claim); see also 66 Am. Jur. 2d 604, Restitution and Implied Contracts § 8 (2001) ([u]njust enrichment is also referred to as . . . a contract implied in law)." (Citations omitted; internal quotation marks omitted.) *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 574, 898 A.2d 178 (2006).

quotation marks omitted.) *Meaney* v. *Connecticut Hospital Assn., Inc.*, 250 Conn. 500, 517, 735 A.2d 813 (1999); see also *H. B. Toms Tree Surgery, Inc.* v. *Brant*, 187 Conn. 343, 347, 446 A.2d 1 (1982) ("parties who have entered into controlling express contracts are bound by such contracts to the exclusion of inconsistent implied contract obligations"); *Polverari* v. *Peatt*, 29 Conn. App. 191, 199, 614 A.2d 484 (same), cert. denied, 224 Conn. 913, 617 A.2d 166 (1992); 66 Am. Jur. 2d 621, Restitution and Implied Contracts § 24 (2001). Thus, in *Meaney*, we concluded that an employee could not recover in unjust enrichment against his employer for its failure to pay him incentive compensation when there existed an express, enforceable employment contract that set the terms of the employee's salary but did not provide for such compensation, and the employee did not claim that he had performed services not contemplated by that contract. *Meaney* v. *Connecticut Hospital Assn., Inc.*, supra, 517; see also *Lightfoot* v. *Union Carbide Corp.*, 110 F.3d 898, 905–906 (2d Cir. 1997) (employer's enrichment by retention of profits realized from former employee's inventions was not unjust because employment contract provided for assignation of employee's inventions to employer).

Nevertheless, "when an express contract does not fully address a subject, a court of equity may impose a remedy to further the ends of justice." *Klein* v. *Arkoma Production Co.*, 73 F.3d 779, 786 (8th Cir.), cert. denied sub nom. *Jones* v. *Klein*, 519 U.S. 815, 117 S. Ct. 65, 136 L. Ed. 2d 27 (1996); see also *Rent-A-PC, Inc.* v. *Rental Management, Inc.*, 96 Conn. App. 600, 606, 901 A.2d 720 (2006) ("the existence of a contract, in itself, does not preclude equitable relief *which is not inconsistent with the contract*" [emphasis added]); *Porter* v. *Hu*, 116 Haw. 42, 54, 169 P.3d 994 (App. 2007) ("[w]hile it is stated that an action for unjust enrichment cannot lie in the face of an express contract, a contract does not

preclude restitution if it does not address the specific benefit at issue"), cert. denied, 117 Haw. 321, 179 P.3d 263 (2008); 66 Am. Jur. 2d 622, supra, § 25 ("[a]lthough there can be no implied contract on a point fully covered by an express contract and in direct conflict therewith, there may be an implied contract on a point not covered by an express contract"); 1 G. Palmer, Restitution (1978) § 1.2, p. 8 ("[s]ome of quasicontract's most important work is done in cases in which there was an express contract between the parties").

In *Klein* v. *Arkoma Production Co.*, supra, 73 F.3d 786, a case with a dynamic remarkably similar to the present one, the United States Court of Appeals for the Eighth Circuit concluded that express agreements between the parties did not preclude the plaintiffs' recovery in unjust enrichment because they did not address the matter at issue, namely, the rights to certain lawsuit settlement proceeds. The plaintiffs were royalty owners of natural gas rights who leased production rights to the named defendant. Id., 782. Pursuant to the parties' lease agreements, the named defendant was to pay the plaintiffs "market value" of one eighth of the gas the named defendant ultimately produced and sold. Id., 782, 786. A pricing dispute developed with one of the named defendant's contract purchasers, giving rise to the named defendant's contract claim against the purchaser for failing to pay approximately $36 million. Id., 783. The named defendant and the purchaser subsequently settled that claim by effecting a complex series of transactions pursuant to which, inter alia, the purchaser became owner of the named defendant. Id. The named defendant's two shareholders received $173 million, part of which, the Court of Appeals determined, represented a premium for the settlement of the named defendant's claim against the purchaser. Id. The shareholders, however, did not forward a portion of that premium to the plaintiffs. Id., 786.

The Court of Appeals concluded that the shareholders were unjustly enriched by their retention of one eighth of the settlement premium that, under the circumstances, rightly belonged to the plaintiffs. Id., 786–87. In so concluding, the Court of Appeals disagreed that the parties' lease agreements, although they addressed the topic of what the named defendant was required to pay the plaintiffs, also governed the determination of whether the plaintiffs were entitled to a portion of the settlement funds. Id., 786. Specifically, the lease agreements did "not address whether [the] settlement fits within the definition of the 'market value' of gas produced and sold under the leases." Id. Accordingly, the rightful disposition of the settlement funds properly was the subject of a claim in unjust enrichment. Id.

Given *Klein*'s similarity to the present case, we find the Court of Appeals' conclusion to be instructive. In *Klein*, the payments due to the plaintiffs, pursuant to a fee setting provision in the parties' express lease agreements, were affected directly by a third party's wrongful failure to pay amounts owed to the named defendant. See id. In the present matter, payments due from the plaintiffs, pursuant to the tip fee setting provision of the parties' express contracts, were affected directly by Enron's wrongful failure to pay amounts due to the defendant. In *Klein*, when the named defendant pursued third party litigation and ultimately recovered the amounts wrongfully withheld, equity demanded that it share the settlement proceeds with the plaintiffs because they represented, in part, amounts formerly due to the plaintiffs under the parties' lease agreements. In the present matter, because the defendant has pursued third party litigation and ultimately recovered amounts wrongfully withheld, equity demands that it share the settlement proceeds with the plaintiffs

because those proceeds represent shortfalls formerly borne by the plaintiffs under the parties' contracts.

In *Klein*, the parties' lease agreements, although they addressed the calculation of lease payments, did not answer the question of the proper disposition of settlement funds received by the named defendant from a third party when those settlement funds represented payments previously due to the defendant from the third party, and the nonpayment, by extension, had affected the amount of the lease payments due to the plaintiffs. Similarly, in this case, the parties' contracts, although they address the calculation of tip fees, simply do not answer the question of the proper disposition of settlement funds received by the defendant from third parties when those settlement funds represent payments previously due from Enron, and the nonpayment, by extension, had factored into a determination of the tip fee charged to the plaintiffs.

The amount by which the trial court found that the defendant was unjustly enriched was based, in part, on a consideration of how much the plaintiffs' tip fees had increased.[26] Nevertheless, the trial court's conclusion that the defendant was unjustly enriched was not dependent on a determination of what the tip fee should have been, a topic covered by the parties' express contracts, nor does it suggest that the defendant was unjustly enriched by its collecting of the tip fees alone. Rather, the court determined what ought to be done to prevent inequity when a revenue shortfall that was factored into past tip fees *subsequently is recouped* from third parties and retained by the defendant. Like the Court of Appeals for the Eighth Circuit, we are not persuaded that, merely because the focus of the plaintiffs' unjust enrichment

---

[26] As previously explained, the amount awarded by the trial court also was based on the portion of the nonproject ventures account attributable to the plaintiffs' tip fees that was used to defray project expenses following Enron's collapse.

claim bears an indirect relation to the subject matter of the parties' express contract, the unjust enrichment claim is barred. "A claim for unjust enrichment is an equitable claim. In matters of equity, the court is one of conscience which should be ever diligent to grant relief against inequitable conduct, however ingenious or unique the form may be." Id. On the basis of the foregoing analysis, the defendant's first argument fails.

The defendant also argues that the relief granted by the court was inconsistent with a limitation of remedies provision in the parties' contracts that disallowed the plaintiffs from recovering "damages." According to the defendant, the ordinary meaning of "damages" is monetary relief, regardless of its basis. We are not persuaded.

The following additional facts and procedural history are relevant. In finding that the defendant was unjustly enriched and awarding the restitutionary remedy of a constructive trust, the trial court was unpersuaded by a special defense in which the defendant argued that a limitation of remedies provision in the parties' contracts applied to foreclose monetary relief to the plaintiffs. Specifically, § 506 of those contracts provides in relevant part that "[f]ailure on the part of the [defendant] in any instance or under any circumstances to observe or fully perform any obligation assumed by or imposed upon it by the [c]ontract or by law *shall not make the [defendant] liable in damages to the [plaintiffs]* . . . ." (Emphasis added.) That section provides further, however, that the defendant "specifically recognizes that the [plaintiffs are] entitled to sue the [defendant] for injunctive relief, mandamus, [and] specific performance *or to exercise such other legal or equitable remedies, not herein excluded,* to enforce the obligations and covenants of the [defendant] under this [c]ontract." (Emphasis added.) The trial court rejected the defendant's argument that any type of monetary relief necessarily constituted "damages," which are barred by § 506,

and it agreed with the plaintiffs that an equitable claim for restitution, which is a remedy for unjust enrichment, explicitly was authorized by that section. We agree with the trial court.

Courts and commentators long have recognized the conceptual distinction between damages and restitution. Damages are "intended to provide a victim with monetary compensation for an injury to his person, property or reputation"; *Bowen* v. *Massachusetts*, 487 U.S. 879, 893, 108 S. Ct. 2722, 101 L. Ed. 2d 749 (1988); whereas restitution aims to deprive a defendant of unjustly obtained benefits. See *Leisure Resort Technology, Inc.* v. *Trading Cove Associates*, 277 Conn. 21, 40, 889 A.2d 785 (2006). "The restitution claim stands in flat contrast to the damages action . . . . The damages recovery is to compensate the plaintiff, and it pays him . . . for his losses. The restitution claim, on the other hand, is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep." D. Dobbs, Remedies (1973) § 4.1, p. 224.

It is equally clear that "[t]he recovery of restitution may take several forms, including the return of the specific property conveyed *or the payment of the monetary value of the defendant's gain.*" (Emphasis added.) *Leisure Resort Technology, Inc.* v. *Trading Cove Associates*, supra, 277 Conn. 40; see also D. Dobbs, supra, § 1.1, p. 1 ("restitutionary remedy may or may not involve a money recovery"). Simply put, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.' " *Bowen* v. *Massachusetts*, supra, 487 U.S. 893. Rather, the proper characterization of a monetary remedy turns on what that remedy represents. "[T]he money recovery called damages is based upon the plaintiff's loss, and in that respect stands in bold contrast to the money recovery called restitution,

which is based upon the defendant's gain." D. Dobbs, supra, § 3.1, p. 137.

It is abundantly clear that the monetary relief awarded in this case is restitutionary in nature and, therefore, the awarding of it is not contrary to any express contract provision. As we have explained, the trial court did not find that the defendant had been unjustly enriched by charging the plaintiffs increased tip fees, but rather, because the defendant had retained the settlement funds that it recovered from third parties after charging those increased tip fees. The monetary relief awarded as restitution reflects this distinction. Although the $35,873,732 awarded was calculated, in part, by consideration of tip fee increases, the plaintiffs claimed, and submitted evidence to show, that they had sustained total damages in excess of $69 million flowing from the failed Enron transaction. The amount claimed, consistent with the compensatory nature of a damages award, reflected the difference between the plaintiffs' actual tip fees and what the tip fees would have been if the defendant had not entered the Enron transaction, but, instead, had used the buy down proceeds to defease remaining project bonds. The amount of the constructive trust awarded by the trial court as restitution, in contrast, was substantially less than that figure and, as the court made clear, was intended only to disgorge from the defendant the amount by which it had been unjustly enriched and not to compensate the plaintiffs fully for their losses. Accordingly, we reject the defendant's argument that the trial court improperly awarded damages in contravention of the parties' contracts.

2

The defendant claims next that the trial court improperly found that it had been unjustly enriched by its retention of $14.8 million of the settlement funds because its board voted to rebate that portion of the

funds to the plaintiffs but was prevented from doing so by an order of the court. We disagree.

The following additional facts and procedural history are relevant. On December 6, 2006, while the trial in this matter was ongoing, the defendant's board voted to approve a $21 million settlement of its claims against Hawkins (Hawkins funds). Shortly thereafter, the plaintiffs filed a motion to enjoin the defendant from utilizing the Hawkins funds without prior approval of the court. Contemporaneous with the filing of that motion, the plaintiffs' counsel argued to the court that the Hawkins funds were directly traceable to the Enron transaction and, therefore, an identifiable res potentially subject to the imposition of a constructive trust. See part I B of this opinion. The plaintiffs' counsel argued further that, in the past, the defendant purposefully had dissipated other litigation recoveries that potentially could have been subject to a constructive trust. The trial court decided to defer any hearing on the plaintiffs' motion until the defendant's board approved a specific plan for use of the Hawkins funds. The defendant's counsel agreed to apprise the court when that occurred.

The trial concluded on January 9, 2007, and, on February 2, 2007, before the trial court issued its memorandum of decision, the defendant filed a "Notice of the Board-Approved Plan for Use of Settlement Funds." Therein, the defendant indicated that it intended to rebate $14.8 million of the Hawkins funds to the plaintiffs, but also that it would use the balance of that settlement, as well as $2.8 million received in connection with other Enron related litigation, for other purposes. On February 8, 2007, the plaintiffs applied for a prejudgment remedy attaching, inter alia, the Hawkins funds and future settlement funds traceable to the Enron transaction.

At a February 9, 2007 hearing[27] on the application for a prejudgment remedy, the plaintiffs again argued that the Hawkins funds and other potential settlement funds were the only identifiable res potentially subject to a constructive trust, that the attachment was necessary to protect their right to recover via that remedy and that the defendant had other funds available to use for the stated purposes. As to the $14.8 million that the defendant had voted to return to the plaintiffs, the plaintiffs' counsel noted that the Hawkins funds had been received before evidence in the case had concluded, and that there had been no offer to return the $14.8 million then. Moreover, the plaintiffs' counsel offered to negotiate with defense counsel a mechanism for the return of the Hawkins funds, following an order of attachment, to ensure that any eventual judgment in the plaintiffs' favor would not result in a double recovery. Defense counsel did not respond to that offer but argued, in short, that the defendant's planned use of the Hawkins funds was appropriate and that the probable cause of the plaintiffs' success on the merits, a prerequisite for an attachment in the amount sought, was lacking. In response to the trial court's query whether the defendant could distribute the $14.8 million to the plaintiffs while the other $9 million remained subject to attachment, defense counsel asserted that it was not possible. On February 15, 2007, the trial court granted the plaintiffs' application as to the Hawkins funds and settlement funds obtained in the future, particularly, with respect to their request for imposition of a constructive trust. Thereafter, in its June 19, 2007 memorandum of decision, the trial court concluded that the

---

[27] A substantial portion of the hearing was devoted to a motion for contempt that the plaintiffs had filed the day before the hearing, in which the plaintiffs complained that the defendant had violated an earlier court order by engaging in improper communications with members of the plaintiff class. See New Hartford v. Connecticut Resources Recovery Authority, supra, 291 Conn. 489.

defendant would be unjustly enriched if it were permitted to retain the Hawkins funds or other lawsuit settlement proceeds.

The defendant now argues that the trial court improperly concluded that it was unjustly enriched by its retention of $14.8 million of the Hawkins funds subject to the attachment, because it intended to return that amount to the plaintiffs but was thwarted by the court's attachment order. The plaintiffs argue in response that the $14.8 million properly was a subject of the trial court's unjust enrichment finding because the defendant offered to return it only after this case had been fully litigated, the defendant had refused to commit to its return previously and the offer to return it was conditioned on the plaintiffs' agreeing to forgo pursuit of an attachment on the remaining settlement funds contemplated by the board approved plan. We agree with the plaintiffs.

The foregoing summary of the circumstances surrounding the attachment order demonstrates that the defendant was not willing to return $14.8 million of the Hawkins funds to the plaintiffs unless the remainder of the existing settlement funds remained in its control, to dispose of as it preferred. The trial court had before it voluminous evidence regarding the defendant's financial resources and obligations and its historical budgeting decisions, as well as the representations of its counsel indicating that the board's approved distribution plan for the settlement funds was, in essence, a package deal. The court apparently relied on the evidence and representations to conclude that the defendant's offer was conditional and that the plaintiffs' concern that the defendant was attempting at the eleventh hour to dissipate the only remaining funds potentially available for a constructive trust, was a legitimate one.

We agree that, if the defendant truly had intended to return the $14.8 million to the plaintiffs with no conditions attached, the trial court's decision to thwart that plan by imposing an attachment and its subsequent finding that the defendant was unjustly enriched by its retention of the funds would be illogical. Nevertheless, because the defendant intended to go forward with the proposed rebate *only* if it were coupled with the right to expend the remainder of the existing settlement funds, thus lessening the identifiable res at which the plaintiffs' pending constructive trust request was directed, the trial court's finding of unjust enrichment, despite its earlier order of attachment, was entirely reasonable. Accordingly, there was no abuse of discretion.

B

Constructive Trust

The defendant claims next that the trial court improperly imposed a constructive trust over the settlement proceeds obtained from the law firms. Relying on the Appellate Court's holding in the related case of *West Hartford* v. *Murtha Cullina, LLP*, 85 Conn. App. 15, 857 A.2d 354, cert. denied, 272 Conn. 907, 863 A.2d 700 (2004), the defendant argues that, because that case established that the town of West Hartford, also a plaintiff in this case, lacked standing to bring a direct action against Murtha and Hawkins, from which the settlement proceeds were obtained by the defendant, the settlement proceeds are not an identifiable res in which the plaintiffs have a direct interest. We disagree that the Appellate Court's opinion in *West Hartford* v. *Murtha Cullina, LLP*, supra, 22–23, precludes the imposition of a constructive trust.[28]

---

[28] The defendant also claims that the trial court's imposition of a constructive trust was improper because, as a matter of law, the plaintiffs could not prevail on the theory of unjust enrichment, a prerequisite for imposing the trust. Because we have rejected the defendant's arguments pertaining to the trial court's finding of unjust enrichment; see part I A of this opinion; this claim necessarily fails.

"A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. . . . The imposition of a constructive trust by equity is a remedial device designed to prevent unjust enrichment. . . . Thus, a constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." (Citations omitted; internal quotation marks omitted.) *Cohen* v. *Cohen*, 182 Conn. 193, 203, 438 A.2d 55 (1980); see also Restatement (Third), Restitution and Unjust Enrichment § 55 (Tentative Draft No. 6, 2008). "A claimant entitled to restitution from property may obtain restitution from any traceable product of that property, without regard to subsequent changes of form." Restatement (Third), supra, § 58 (1). A claimant seeking a constructive trust "must identify property in the hands of the [defendant] that represents or embodies . . . property obtained at the claimant's expense or in violation of the claimant's rights." Id., § 58, comment (a), p. 1256.

In *West Hartford* v. *Murtha Cullina, LLP*, supra, 85 Conn. App. 20, the Appellate Court affirmed the dismissal of an action brought by the town of West Hartford directly against Murtha and Hawkins for damages resulting from their negligent representation of the defendant in connection with the Enron transaction.[29] The trial court had dismissed West Hartford's claims for lack of standing, agreeing with Murtha and Hawkins

---

[29] West Hartford also alleged that Murtha had violated the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., and that Hawkins had breached its legal services agreement with the defendant, of which West Hartford claimed it was a third party beneficiary. *West Hartford* v. *Murtha Cullina, LLP*, supra, 85 Conn. App. 19.

that West Hartford's injuries were indirect and derivative of the defendant's injuries and, therefore, that the defendant was better suited to assert the claims raised. Id., 22–23.

In affirming the trial court's dismissal, the Appellate Court in *West Hartford* noted three considerations articulated by this court in *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 353, 780 A.2d 98 (2001), for determining whether a party's injuries are direct enough to confer standing to sue: "First, the more indirect an injury is, the more difficult it becomes to determine the amount of [the] plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the . . . acts, in order to avoid the risk of multiple recoveries. Third, struggling with the first two problems is unnecessary where there are directly injured parties who can remedy the harm without these attendant problems." (Internal quotation marks omitted.) *West Hartford* v. *Murtha Cullina, LLP*, supra, 85 Conn. App. 21–22. The Appellate Court, however, ultimately rested its decision entirely on the third consideration, noting that the defendant already was pursuing litigation against Murtha and Hawkins and concluding that the defendant, the *"more directly* injured party . . . can vindicate [West Hartford's] *rights* through direct litigation." (Emphasis added.) Id., 22–23.

In so concluding, the Appellate Court did not hold that West Hartford, or, by extension, the plaintiffs in this case, had no interest whatsoever in the proceeds of the malpractice actions against Murtha and Hawkins. Rather, it acknowledged that West Hartford had an interest in a potential recovery, but held nevertheless that that interest already was being represented effec-

tively by the defendant. The defendant does not cite any authority for the proposition that the interest necessary to bring an action against a third party directly is coextensive with the interest necessary to seek a constructive trust over proceeds obtained from that party in litigation pursued by another, and we are unaware of any. Our research suggests that the opposite is true.

Although unjust enrichment typically arises from a plaintiff's direct transfer of benefits to a defendant, it also may be indirect, involving, for example, a transfer of a benefit from a third party to a defendant when the plaintiff has a superior equitable entitlement to that benefit. See, e.g., Restatement (Third), Restitution and Unjust Enrichment § 48, comment (d) (1) (Tentative Draft No. 5, 2008) (discussing "cases in which the defendant has been compensated or reimbursed by a third party for costs or expenditures incurred by the claimant"). "If a payment to [a] defendant is an asset to which the claimant (as against defendant) has the paramount entitlement, the law of restitution and unjust enrichment supplies a claim to recover the amount in dispute." Id., § 48, comment (a).

Thus, in *Estes* v. *Thurman*, 192 S.W.3d 429, 432 (Ky. App. 2005), the plaintiffs, installment purchasers of property destroyed by fire during the installment period, were awarded a constructive trust over insurance proceeds in excess of the remaining amount owed under the installment contract after those proceeds had been collected and retained by the seller. The seller had procured the policy, paid the premiums and was the named beneficiary and, therefore, was the only party having a contractual right to collect the proceeds. Id. Nevertheless, the plaintiffs, as equitable owners[30] of the

---

[30] The seller was to remain the titleholder of the property until the final installment payment had been remitted. See *Estes* v. *Thurman*, supra, 192 S.W.3d 430, 431.

insured property, were held to have an interest in the proceeds sufficient to warrant imposition of a constructive trust over the proceeds to the extent that they were above and beyond the amount necessary to make the seller whole. Id., 431–32; see also *Counihan* v. *Allstate Ins. Co.*, 194 F.3d 357, 361–62 (2d Cir. 1999) (affirming award of constructive trust in favor of United States over insurance proceeds collected by property owner after property destroyed by fire during forfeiture proceedings).

In *In re Estate of Turer*, 27 Wis. 2d 196, 198, 133 N.W.2d 765 (1965), the respondent, the decedent's second husband, had paid for the support and maintenance of the decedent's two children, the issue of her first marriage, while she pursued an action against her first husband for child support. The decedent died before recovering anything in the action, and her will devised all of her property in trust for the children. Id. Thereafter, the decedent's estate recovered from her first husband a sum that represented support payments that had been due during the period in which the second husband had contributed to the children's upkeep. The Supreme Court of Wisconsin upheld the second husband's recovery in unjust enrichment from the decedent's estate on the ground "that an identifiable fund was in the hands of the executor, that the fund represented the accrued obligation of the children's father to contribute to the support of the children in the past, and that [the second husband] had furnished more than that amount of money in order to support them." Id., 200. Accordingly, the second husband had an equitable claim upon the fund. Id. Again, the second husband's restitutionary claim against the decedent's estate was not precluded merely because he personally could not have pursued the support action against the decedent's first husband.

Finally, in *Klein* v. *Arkoma Production Co.*, supra, 73 F.3d 779, discussed in part I A 1 of this opinion, the plaintiff lessors could not have asserted legal claims directly against the purchaser who contracted with their lessee when that purchaser failed to abide by the contract. Nevertheless, because the amount of the payments due under the parties' lease agreement were calculated on the basis of the lessee's sales, when the lessee and the purchaser settled their contract dispute, the lessor was held to have an interest in the settlement funds pursuant to a theory of unjust enrichment. Id., 786–87.

The reasoning of the foregoing cases is persuasive. We conclude, therefore, that although the plaintiffs lacked standing to pursue claims directly against Murtha and Hawkins, they had an equitable interest in the settlement funds recovered from the law firms by the defendant. Consequently, the trial court's imposition of a constructive trust over those funds was proper.

C

Class Certification

The defendant claims next that the trial court improperly certified the plaintiffs as a class because the certification criteria of Practice Book § 9-7 were not satisfied. Specifically, the defendant argues that the requirement of numerosity—that is, that the class was so numerous that joinder of all parties was impracticable—was unmet. For that reason, according to the defendant, even if this court concludes that there is no other impropriety in the trial court's judgment, it nevertheless should vacate that judgment, decertify the class and remand this matter for further proceedings as to the named plaintiff only. We are not persuaded.

The standard of review and legal principles governing class certification orders are well settled. "A trial court

must undertake a rigorous analysis to determine whether the plaintiffs have borne the burden of demonstrating that the class certification requirements of Practice Book §§ 9-7 and 9-8[31] have been met. . . . A trial court nonetheless has broad discretion in determining whether a suit should proceed as a class action. . . . As long as the trial court has applied the proper legal standards in deciding whether to certify a class, its decision may . . . be overturned [only] if it constitutes an abuse of discretion. . . .

"[I]n determining whether to certify the class, a [trial] court is bound to take the substantive allegations of the complaint as true. . . . That does not mean, however, that a court is limited to the pleadings when determining whether the requirements for class certification have been met. On the contrary . . . [t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the [plaintiffs'] cause of action . . . and . . . it [sometimes] may be necessary for the court to probe behind the pleadings before coming to rest on the certification question. . . . In determining the propriety of a class action, [however] the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits . . . but rather whether the requirements of [the class action rules] are met. . . . *Although no party has a right to proceed via the class [action] mechanism . . . doubts regarding the propriety of class certification should be resolved in favor of certification. . . .*

"The rules of practice set forth a two step process for trial courts to follow in determining whether an action or claim qualifies for class action status. First, a court must ascertain whether the four prerequisites to a class action, as specified in Practice Book § 9-7,

---

[31] See footnote 5 of this opinion.

are satisfied. These prerequisites are: (1) numerosity—that the class is too numerous to make joinder of all members feasible; (2) commonality—that the members have similar claims of law and fact; (3) typicality—that the [representative] plaintiffs' claims are typical of the claims of the class; and (4) adequacy of representation—that the interests of the class are protected adequately. . . .

"Second, if the foregoing criteria are satisfied, the court then must evaluate whether the certification requirements of Practice Book § 9-8 are satisfied. These requirements are: (1) predominance—that questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and (2) superiority—that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. . . . *Because our class certification requirements are similar to those embodied in rule 23 of the Federal Rules of Civil Procedure, and our jurisprudence governing class actions is relatively undeveloped, we look to federal case law for guidance in construing the provisions of Practice Book §§ 9-7 and 9-8.*" (Emphasis added; internal quotation marks omitted.) *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 287 Conn. 208, 212–15, 947 A.2d 320 (2008). "Finally, we give greater deference to a trial court's decision to certify a class than to its decision declining to do so." *Macomber* v. *Travelers Property & Casualty Corp.*, 277 Conn. 617, 628, 894 A.2d 240 (2006); see also *Marisol A.* v. *Giuliani*, 126 F.3d 372, 375 (2d Cir. 1997). With this general framework in mind, we turn to the claim raised.

The following additional procedural history is relevant. After a hearing held on March 3, 2006, the trial court, on March 21, 2006, granted the named plaintiff's motion for class certification. In its memorandum of decision granting certification, the court found that the

named plaintiff had satisfied all of the requirements of Practice Book §§ 9-7 and 9-8 for maintaining a class action.[32] In determining that the numerosity requirement was met, the trial court considered multiple factors relevant to the question of whether joinder was impracticable[33] and concluded that the various factors weighed in either direction. The court observed that, "[i]n balance, if [it] were to consider all of [those] factors, [the named plaintiff's] arguments regarding numerosity would probably fail."

The trial court proceeded, however, to analyze certain precertification communications that representatives of the defendant had made to potential class members in regard to the pending litigation, and concluded that the effect of those communications tipped the balance in favor of a finding that the numerosity requirement had been established. In particular, the defendant's management, in an August 17, 2005 letter and at a series of meetings, had attempted to dissuade class members from participating in the lawsuit, and Kirk, in a March 18, 2004 letter, had advised class members that the lawsuit ultimately would cost them more in tipping fees such that, in effect, they would be "suing themselves." The trial court found Kirk's assertion to be misleading because indemnification provisions in the legal services agreements between the defendant and its counsel for the Enron transaction potentially were applicable to satisfy a judgment in favor of the plaintiffs. Additionally, the court found, the defendant

---

[32] The defendant did not contest that the factors of commonality, typicality and predominance were established. It challenged only the issues of numerosity, adequacy of representation and superiority.

[33] Those factors include: "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of [putative] class members, financial resources of [putative] class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Robidoux* v. *Celani*, 987 F.2d 931, 936 (2d Cir. 1993).

had informed class members of the legal fees it was incurring, but failed to explain that they were covered, in large part, by insurance. The court found further that statements made by the defendant to class members, indicating that the lawsuit was impeding settlements in other litigation which would lead to rebates to class members, were contrary to the defendant's official position, as reflected in Kirk's testimony, that it would not reimburse the plaintiffs from proceeds of its pending claims against third parties until the annual shortfall resulting from the Enron transaction was fully offset. Finally, the court found that Kirk's statement in his August 17, 2005 letter, that this litigation precluded the distribution of an arbitration award obtained in a dispute unrelated to the Enron transaction, was inconsistent with his deposition testimony, in which he had testified that he made a personal decision to set aside the proceeds of that award as an undesignated reserve for contingent costs unrelated to this litigation.

The trial court concluded that the foregoing communications were misleading and that they constituted an "additional circumstance . . . militat[ing] in favor of the [named] plaintiff regarding the impracticability of joinder." According to the court, "the existence of these [misleading] statements has made it difficult, if not impossible, for the [named plaintiff] to pursue [its] efforts regarding joinder in this case. The [potential class members] may well believe that they will have increased costs by joining the lawsuit. In view of the statements, joinder is not practicable in this case. [The named plaintiff] meet[s] the requirements for numerosity as part of [its] motion for class certification."

The defendant argues that the trial court's approach for finding the numerosity requirement satisfied was improper because there is no Connecticut authority to support it, and, as the trial court acknowledged, its finding of numerosity was a close call. The plaintiffs

disagree and direct us to several cases from other juris-
dictions in which a class action defendant's misleading
communications or coercive behavior factored into the
court's certification order. We agree with the plaintiffs
that the trial court did not abuse its discretion in consid-
ering the defendant's communications to potential class
members to find the numerosity requirement estab-
lished.[34]

To begin, pursuant to Connecticut's limited jurispru-
dence concerning the numerosity requirement, as well
as analogous federal decisions to which we look for
guidance, it is clear that a proper determination of num-
erosity is not through application of any rigid formula,
but rather, by a flexible inquiry taking into account the
entirety of the particular action. "There is no magic
number for determining whether, in a particular case,
joinder of all putative parties will be impracticable. . . .
[Rather] [t]he issue is one to be resolved in light of
the facts and circumstances of the case." (Citations
omitted.) *Walsh* v. *National Safety Associates, Inc.*, 44
Conn. Sup. 569, 583, 695 A.2d 1095 (1996), aff'd, 241
Conn. 278, 282, 694 A.2d 795 (1997) (adopting trial
court's opinion);[35] see also *Robidoux* v. *Celani*, 987 F.2d

[34] Citing generally to a treatise on the law of defamation, the defendant
also argues that the statements of its representatives that the court found
to be misleading could not, as a matter of law, be "misrepresentations"
because they were mere opinions. We disagree that all of the statements
cited by the court are properly characterized as opinions and, in any event,
that the tort liability principle now cited by the defendant constrained the
trial court from considering, in the context of a class certification determina-
tion, the effect of those communications on the potential class members'
willingness to participate in this action. We emphasize that the defendant
has not challenged the court's findings that the statements at issue are
contradicted by other evidence in the record, nor does it attest that the
other evidence is unreliable.

[35] Although the cases vary widely, "[a] leading treatise concludes, based
on prevailing precedent, that the difficulty in joining as few as [forty] class
members should raise a presumption that joinder is impracticable." *Robi-
doux* v. *Celani*, 987 F.2d 931, 936 (2d Cir. 1993); see 1 A. Conte & H. Newberg,
Newberg on Class Actions (4th Ed. 2002) § 3:5, p. 247.

931, 936 (2d Cir. 1993) ("[d]etermination of practicability depends on all the circumstances surrounding a case, not on mere numbers"); *Arduini* v. *Automobile Ins. Co. of Hartford, Connecticut*, 23 Conn. App. 585, 590, 583 A.2d 152 (1990) (same); 1 A. Conte & H. Newberg, Newberg on Class Actions (4th Ed. 2002) § 3:3, pp. 220–21 ("[t]o make a determination of joinder impracticability, a court must make a practical judgment based on the facts of the case"). Furthermore, "[t]he numerosity requirement . . . does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Central States Southeast & Southwest Areas Health & Welfare Fund* v. *Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244–45 (2d Cir. 2007).

Additionally, there is substantial support in federal and sister state case law, all involving similar class certification rules, that a class action defendant's inappropriate or misleading communications with potential class members properly may be considered by a trial court during certification proceedings, although the precise context of the consideration varies.[36] See, e.g.,

---

[36] We disagree with the defendant's assertions, pressed in its reply brief, that pursuant to Practice Book § 9-7, the trial court could consider the communications at issue only to the extent that they had the effect of reducing the potential class size, and, therefore, that the court "improperly reframed the question as whether misleading statements by the defendant rendered joinder of all members impracticable." According to the defendant, "the practicability of joinder always turns solely on the number of potential class members—even when a court considers evidence of misleading efforts to dissuade class members from joining the class." The defendant's argument ignores the case law previously articulated that the numerosity requirement does not require proof of some magic number of potential class members and that all surrounding facts and circumstances must be considered. *Walsh* v. *National Safety Associates, Inc.*, supra, 44 Conn. Sup. 583. Furthermore, contrary to the defendant's stated view, § 9-7 of the rules of practice, like its federal counterpart, is "[i]n reality . . . an impracticability of joinder requirement, of which class size is an inherent consideration within the rationale of joinder concepts. The practicability of joinder must be evaluated in light of the circumstances of the particular litigation." 1 A. Conte & H. Newberg, supra, § 3:3, p. 218.

*Belt* v. *EmCare, Inc.*, 299 F. Sup. 2d 664, 669–70 (E.D. Tex. 2003) (extending period for becoming class member after defendant sent unauthorized, misleading, coercive letter to potential class members, intending to undermine action); *Impervious Paint Industries, Inc.* v. *Ashland Oil*, 508 F. Sup. 720, 724 (W.D. Ky.) (restoring class members who had opted out after improper communications by defendant), appeal dismissed, 659 F.2d 1081 (6th Cir. 1981); *Fraley* v. *Williams Ford Tractor & Equipment Co.*, 339 Ark. 322, 334–35, 343, 5 S.W.3d 423 (1999) (concluding that trial court abused discretion in finding numerosity requirement unsatisfied after considering putative class member releases obtained by defendant in deceptive and coercive manner); *Turner* v. *Bernstein*, 768 A.2d 24, 39–40 (Del. Ch. 2000) (rejecting defendants' claim that adequacy requirement unmet when affidavits from potential class members objecting to action were solicited by defendants in unsupervised, one-sided manner); see also 5 A. Conte & H. Newberg, supra, § 15:2, p. 8 (class action defendants' improper attempts to encourage class members to opt out and miscommunications to class members may be controlled by, inter alia, court's "initial power to rule on the propriety of class certification"). The foregoing authority persuades us that such considerations also are appropriate for a Connecticut court to weigh in making a certification decision pursuant to Practice Book § 9-7, and, in a close case, properly may tip the balance in favor of a finding of numerosity, and hence, in favor of certification. See *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, supra, 287 Conn. 213–14.

In reviewing a trial court's action for an abuse of discretion, "every reasonable presumption should be given in favor of its correctness. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.)

*Wyszomierski* v. *Siracusa*, 290 Conn. 225, 233, 963 A.2d 943 (2009). "[R]eversal is required [only] where the abuse is manifest or where injustice appears to have been done." (Internal quotation marks omitted.) *Rivera* v. *Veterans Memorial Medical Center*, 262 Conn. 730, 743, 818 A.2d 731 (2003). We conclude that the trial court's decision to certify the plaintiffs as a class, which rested in part on its proper finding of numerosity, was a reasonable one and that the defendant has failed to show the manifest abuse of discretion or injustice necessary to disturb the court's action. Consequently, this claim fails.

In sum, the trial court properly certified the plaintiffs as a class, found that the defendant was unjustly enriched at the plaintiffs' expense and imposed a constructive trust as a remedy. Accordingly, as to the defendant's first appeal, the judgment is affirmed.

II

THE SECOND APPEAL

(SC 18109)

We now turn to the defendant's second appeal, in which it challenges an order issued by the trial court subsequent to its judgment awarding a constructive trust. In this appeal, the defendant claims that the trial court improperly ordered it to alter its budget and to reduce tip fees to the plaintiffs for fiscal year 2008 because the court's order: (1) was issued in response to an improperly amended complaint alleging a new cause of action and requiring an additional hearing; and (2) was based on a clearly erroneous factual finding. We disagree with each of these claims.

A

The defendant claims first that the trial court improperly ordered it, posttrial, to make adjustments to its

fiscal year 2008 budget, thereby reducing the tip fees charged to the plaintiffs. According to the defendant, that order was issued in response to an improperly amended complaint alleging a new cause of action and requiring an additional hearing. We conclude that the trial court acted within its discretion when it permitted amendment of the complaint and issued the contested order.

The following additional procedural history is relevant. On March 6, 2007, after the trial in this matter had concluded but before the court had rendered judgment, the plaintiffs filed an application to enjoin the defendant "from implementing [an] improper, inflated and retaliatory budget." In the application, the plaintiffs argued that the project budget for fiscal year 2008, which had been adopted by the defendant's board on March 1, 2007, and was to take effect July 1, 2007, contained improper expenses that were not permitted by the parties' contracts and failed to include certain revenues. According to the plaintiffs, the defendant intentionally had inflated budgeted expenses in retaliation for the plaintiffs' pursuit of this litigation and their securing of a prejudgment remedy. The plaintiffs provided detailed allegations in support of these claims, arguing in particular that the defendant was overfunding various reserve accounts and including expenses that would not be incurred in fiscal year 2008. The plaintiffs also cited testimony of the defendant's management at trial regarding its preference to maintain a " 'stable' " tip fee, and argued that such a practice was not permitted by the parties' contracts. They claimed that the fiscal year 2008 budget was a product of that approach. In short, the plaintiffs maintained that the defendant improperly was demanding present payments for operating expenses that might be incurred in future years and was manipulating the budget toward the end of maintaining a particular tip fee, contrary to

the contract provisions limiting charges to the net cost of operation.

On April 11, 2007, the defendant moved to dismiss the plaintiffs' application, arguing that it raised claims unrelated to those raised in the operative complaint and litigated at trial and, therefore, that the trial court lacked jurisdiction to hear the application. On May 9, 2007, after a hearing, the trial court denied the defendant's motion to dismiss and, further, granted the plaintiffs' request, made orally at the hearing, to hear additional testimony. The court, citing portions of the operative complaint, concluded that it was broad enough to include the plaintiffs' request to examine the fiscal year 2008 budget. It observed further that the issue of the defendant's alleged manipulation of project expenses and reserve contributions had been litigated extensively at trial; that the budgets for fiscal years 2002 through 2007 had been examined exhaustively; and that the budget for fiscal year 2008 likely would have been examined if it had been approved when the evidence concluded. According to the court, "[t]he allegations contained in the . . . application certainly cannot come as any surprise to the defendant. The issues are the same. Only the year of the budget has changed. Indeed, the complaint contemplates [the defendant's] budgets in the future." The trial court concluded that it was in the interests of the parties and the ends of justice that it address the claims raised in the application. Thereafter, despite the court's ruling that the allegations of the application were encompassed by the operative complaint, the plaintiffs moved to amend that complaint to aver more specifically how the defendant was manipulating its budgets,[37] and the court, on June 15, 2007, granted the plaintiffs' motion to amend.

[37] The additional allegations were as follows:

"103A. In adopting the [p]roject's annual budgets, as required by its contracts with [the] plaintiffs, [the defendant] has improperly manipulated the determination of the [p]roject's necessary annual operating expenses and the amount of required reserve contributions to maintain a [p]roject tip fee

On June 19, 2007, the trial court rendered judgment on the operative complaint, finding in favor of the plaintiffs on their claims of breach of contract and unjust enrichment and awarding restitutionary relief. The court also awarded injunctive relief to the plaintiffs to "prevent further unjust enrichment . . . ." Specifically, it barred the defendant "from imposing any of the costs of the Enron [t]ransaction on the [plaintiffs], commencing with the [fiscal year 2008] budget and relating to all budget years through the [end of the parties' contractual relationship]." Thereafter, the plaintiffs requested an evidentiary hearing on the application, which the court held on September 5 and 6, 2007. On October 25, 2007, the trial court issued an order enjoining the defendant from implementing the fiscal year 2008 budget as formulated and directing it to reduce four line items by specific amounts, thereby lowering the tip fees charged to the plaintiffs.

The defendant argues that the trial court improperly allowed the amendment of the operative complaint and heard the application for injunctive relief because by doing so, it permitted the plaintiffs, posttrial, to add to the case an entirely new cause of action having no factual nexus to the original claims raised. According to the defendant, the gravamen of the plaintiffs' action was their challenge to the inflated tip fees resulting from the Enron transaction, not from other forms of budgetary impropriety. Additionally, the defendant argues, because the budget contested in the application

at an artificial level, instead of determining the tip fee based upon the [p]roject's true [n]et [c]ost of [o]peration, and continues to do so to date and asserts its right to do so in future [p]roject years.

"103B. [The defendant's] improper manipulation of the [p]roject's expenses and reserves in the determination of the [p]roject's annual budgets has not only had the effect of wrongly inflating [the] plaintiffs' annual tip fee payments, but further has and will in the future continue to have the effect of denying [the] plaintiffs the full benefit of [the defendant's] Enron-related recoveries."

did not exist until early 2007, it is not possible for claims concerning that budget to relate back to the claims raised in the original complaint, which was filed in 2004 and was amended in 2006. The plaintiffs argue in response that the complaint and the evidence adduced at trial encompassed budgetary impropriety broader than that related to the Enron transaction, and that the trial court properly permitted amendment of the complaint to conform to the evidence and, thereafter, ordered injunctive relief pursuant to the application. We agree with the plaintiffs.

The applicable standard of review is well settled. Whether to allow a party to amend its complaint "is a matter left to the sound discretion of the trial court. This court will not disturb a trial court's ruling on a proposed amendment unless there has been a clear abuse of that discretion." (Internal quotation marks omitted.) *Intercity Development, LLC* v. *Andrade*, 286 Conn. 177, 190, 942 A.2d 1028 (2008); see also *Hanson Development Co.* v. *East Great Plains Shopping Center, Inc.*, 195 Conn. 60, 67, 485 A.2d 1296 (1985) ("[a] trial court has wide discretion in granting or denying amendments to the pleadings and rarely will this court overturn the decision of the trial court"). It is the defendant's burden to show that the trial court clearly abused its discretion in allowing the plaintiffs to amend their complaint to encompass the allegations of the application. *Intercity Development, LLC* v. *Andrade*, supra, 190.

Additionally, "[i]t is a well-recognized practice in equity to permit new matter arising subsequent to the complaint to be alleged in a supplemental pleading." *Kelsall* v. *Kelsall*, 139 Conn. 163, 167, 90 A.2d 878 (1952). Furthermore, the new matter need not arise, necessarily, from the same group of facts as the claims alleged in the original pleading. See id., 165 (holding later filed claim of desertion raised new cause of action, not relating back to original claim of intolerable cruelty, because

claims arose from separate and distinct groups of facts). The requirement that an amendment relate back to the factual allegations of the original complaint is of primary importance only when a statute of limitations is implicated.[38] See W. Horton & K. Knox, 1 Connecticut Practice Series: Connecticut Superior Court Civil Rules (2009) § 10-60, comment (3), p. 558 ("[t]he question of what constitutes a new cause of action may be crucial

---

[38] The cases cited by the defendant in direct support of this claim both involved amended pleadings subject to statute of limitations defenses. See *Deming* v. *Nationwide Mutual Ins. Co.*, 279 Conn. 745, 775–77, 905 A.2d 623 (2006); *Saphir* v. *Neustadt*, 177 Conn. 191, 206–207, 413 A.2d 843 (1979). It is true that, if a party seeks to add new allegations to a complaint and a statute of limitations applicable to those allegations has run since the filing of the complaint, the party must successfully invoke the relation back doctrine before amendment will be permitted. Pursuant to the relation back doctrine, "a party properly may amplify or expand what has already been alleged in support of a cause of action, provided the identity of the cause of action remains substantially the same." (Internal quotation marks omitted.) *Dimmock* v. *Lawrence & Memorial Hospital, Inc.*, 286 Conn. 789, 798, 945 A.2d 955 (2008). Conversely, "[i]f a new cause of action is alleged in an amended complaint . . . it will [speak] as of the date when it was filed"; (internal quotation marks omitted) id.; and, therefore, be time barred. For purposes of the relation back doctrine, "[a] cause of action is that single group of facts which is claimed to have brought about an unlawful injury to the plaintiff and which entitles the plaintiff to relief. . . . A right of action at law arises from the existence of a primary right in the plaintiff, and an invasion of that right by some delict on the part of the defendant. The facts which establish the existence of that right and that delict constitute the cause of action. . . . A change in, or an addition to, a ground of negligence or an act of negligence arising out of the single group of facts which was originally claimed to have brought about the unlawful injury to the plaintiff does not change the cause of action." (Internal quotation marks omitted.) *Wagner* v. *Clark Equipment Co.*, 259 Conn. 114, 129, 788 A.2d 83 (2002). "Our relation back doctrine provides that an amendment relates back when the original complaint has given the party fair notice that a claim is being asserted stemming from a particular transaction or occurrence, thereby serving the objectives of our statute of limitations, namely, to protect parties from having to defend against stale claims . . . ." (Internal quotation marks omitted.) *Alswanger* v. *Smego*, 257 Conn. 58, 65, 776 A.2d 444 (2001). In the present matter, because the allegations in the application indisputably pertained to newly occurring events that are not subject to any limitations provision, the factual nexus requirements of the relation back doctrine are not implicated.

when a plaintiff seeks to expand or alter his complaint subsequent to the expiration of the statute of limitations"); *Farber* v. *Wards Co.*, 825 F.2d 684, 689 (2d Cir. 1987); 6A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure (1990) § 1496, pp. 64–65.[39]

The purpose of supplemental pleading "is to promote as complete an adjudication of the dispute between the parties as is possible." 6A C. Wright, A. Miller & M. Kane, supra, § 1504, p. 177. Nonetheless, the newly raised matter should not be entirely unrelated to the existing allegations. Although "a party may assert separate or additional claims or defenses arising after commencement [of the action] . . . the courts typically require some relationship between the original and the later accruing material." Id., p. 183; see, e.g., *Keith* v. *Volpe*, 858 F.2d 467, 474 (9th Cir. 1988) (finding adequate relationship between original action concerning state's provision of adequate replacement housing for persons displaced by freeway construction as condition of construction and later, supplemental pleading contesting city zoning entities' refusal to approve housing developments intended to provide such replacement housing), cert. denied sub nom. *Hawthorne* v. *Wright*, 493 U.S. 813, 110 S. Ct. 61, 107 L. Ed. 2d 28 (1989). In deciding whether to permit supplementation, a court first should decide "whether the supplemental facts connect [the supplemental pleading] to the original pleading." (Internal quotation marks omitted.) *Weeks* v. *New York*, 273 F.3d 76, 88 (2d Cir. 2001). If there is a relationship between the two pleadings, the court should permit the requested supplementation if it "will promote the economic and speedy disposition of the controversy

[39] We previously have recognized that Connecticut's relation back doctrine is similar to that embodied in rule 15 (c) of the Federal Rules of Civil Procedure and, therefore, we look to authority construing that provision for guidance. See *Gurliacci* v. *Mayer*, 218 Conn. 531, 547, 590 A.2d 914 (1991). We also find guidance in federal jurisprudence concerning supplemental pleading.

between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any other party." *Bornholdt* v. *Brady*, 869 F.2d 57, 68 (2d Cir. 1989); see also Practice Book § 10-60 (b); *Weeks* v. *New York*, supra, 88.

After reviewing the operative complaint, we agree with the trial court that it includes allegations pertaining to general budgetary impropriety and not just claims that the defendant wrongfully burdened the plaintiffs with Enron related losses and, further, that the plaintiffs alleged continuing as well as past improprieties.[40] The permitted amendments merely elaborated on these claims. Moreover, our review of the trial record demonstrates that the topic of whether the defendant manipulated budget items in order to prevent large tip fee fluctuations was the focus of substantial testimony, much of it introduced by the defendant itself in an attempt to justify its budgeting decisions as appropriate.[41] It is beyond dispute that "a trial court may

[40] Specifically, as part of their general allegations, the plaintiffs averred that the defendant improperly had failed to credit operating surpluses to budgets in succeeding years as required by the parties' contracts. In both their breach of fiduciary duty and breach of contract claims, the plaintiffs alleged that the defendant was obligated to the plaintiffs to "avoid incurring unauthorized, illegal, inappropriate or unnecessary costs that would wrongly increase the [n]et [c]ost of [o]peration of the [project], and the [tip] fees to be paid by the [plaintiffs] . . . ." In connection with each of those counts, the plaintiffs claimed that they were "entitled to entry of orders . . . enjoining [the] defendant . . . from imposing improper costs and omitting applicable revenues and surpluses in its calculation of annual [project] budgets . . . ." Finally, as part of their class action allegations, the plaintiffs claimed that both "[t]he Enron [t]ransaction *and* the other illegal, ultra vires *or otherwise improper expenditures complained of in this action* have had the effect of—*and will in the future continue to*—increase the [n]et [c]ost of [o]peration of the [p]roject"; (emphasis added); and, in their prayer for relief, the plaintiffs sought a permanent injunction barring the defendant from further imposing on the plaintiffs the aforementioned expenditures.

[41] In its June 19, 2007 memorandum of decision, the trial court found that a substantial project surplus for fiscal year 2007, was "being funded with tip fee charges in excess of the true net cost of operation of the project for [fiscal year 2007] set by [the defendant] to maintain a 'stable' tip fee."

allow, in its discretion, an amendment to pleadings before, during, or, as here, *after trial* to conform to the proof." (Emphasis added.) *Saphir* v. *Neustadt,* 177 Conn. 191, 206, 413 A.2d 843 (1979); see also Practice Book § 10-62. The permitted amendments to the operative complaint were within the trial court's discretion.

Finally, we are not convinced that the trial court abused its discretion in ruling on the application simply because that application contested actions of the defendant that indisputably occurred subsequent to the filing of the plaintiffs' original and amended complaints. The plaintiffs' application and the original action clearly were related. Both concerned the inclusion of improper expenses and the exclusion of applicable revenues in the project's annual budget, resulting in inflated tip fees to the plaintiffs. Additionally, given the lengthy trial that only recently had concluded and the trial court's consequent familiarity with the extraordinarily complex record, particularly through its "exhaustive" examination of several past years budgets and related documents, we cannot find fault with the court's assessment that "it was in the interests of the parties and the ends of justice that it address the claims raised in the application." See *Keith* v. *Volpe,* supra, 858 F.2d 476 (noting that judicial economy favors supplemental pleading when "[a]ll involved—[the] plaintiffs, [the] defendants, and [the court]—were familiar with the underlying action"). Moreover, the hearing and decision on the application were not unduly delayed, nor did the defendant press for an earlier resolution.[42] Finally, the defendant has not challenged the trial court's finding that the application did not cause the defendant surprise and, hence, prejudice, and none is apparent from the record. On the basis of the foregoing analysis, we conclude that

---

[42] In fact, the parties agreed to defer a hearing on the application until after the trial court rendered judgment on the complaint.

the trial court's postjudgment order, issued in response to the plaintiffs' application, was not improper.

B

The defendant argues additionally that the trial court's order to reduce the tip fees charged to the plaintiffs was based on a clearly erroneous factual finding. We conclude that the defendant has not met its burden of showing the clear error necessary to disturb the court's finding.

"The law governing [our] limited appellate review [of this claim] is clear. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 154–55, 920 A.2d 236 (2007).

In its October 25, 2007 memorandum of decision on the plaintiffs' application to enjoin the defendant from implementing its budget, the trial court analyzed various line items of the project's fiscal year 2008 budget to determine, pursuant to a standard agreed upon by the parties, whether each figure represented a good faith estimate of the amount that line item was expected to be. The court found that five of nine line items challenged did not meet that standard, and ordered that the estimates for those items be modified. The defendant challenges the court's finding and order as to one line item only, specifically, that the Hartford landfill closure

reserve was improperly inflated by $4.885 million and, accordingly, must be reduced by that amount. In making this finding, the trial court relied explicitly on Kirk's testimony, which, the defendant stipulated, reflects its position and the views of its board. The defendant argues, however, that other evidence shows that the landfill closure reserve was not overfunded as the court found. In so arguing, the defendant provides a detailed explanation of the budgeting decisions underlying the estimate at issue and insists that the trial court misconstrued the evidence.

The problem with the defendant's argument as to this claim is that it is entirely dependent on the crediting of evidence that the trial court did not credit, and on subsidiary factual findings that the court did not make. Additionally, it ignores the fact that the trial court made contrary findings on the basis of conflicting evidence, the existence and reliability of which the defendant does not contest directly on appeal.[43] Pursuant to the standard previously articulated, however, an appellate tribunal is bound by the trial court's credibility determinations and its resolution of evidentiary conflicts. Because the defendant has not met the standard for upsetting the trial court's factual finding, we reject its final claim.

We conclude that the trial court did not abuse its discretion in allowing the plaintiffs to amend their complaint and by ordering injunctive relief in response to

[43] On November 2, 2007, the defendant filed a motion to reargue the trial court's October 25, 2007 order, claiming that "the [c]ourt's finding that the Hartford [l]andfill [c]losure [r]eserve was 'inflated' by $4.885 million [was] based on a misapprehension of facts." On November 5, 2007, the court denied the defendant's motion on its face, without issuing any further memorandum of decision. The defendant did not seek further articulation of this order. See Practice Book § 66-5. Consequently, the basis for the trial court's crediting of certain evidence over other evidence is unclear. What is clear, however, is that the trial court did not agree with the defendant's version of the underlying facts.

the plaintiffs' application, and we disagree that the court's order was based on clearly erroneous factual findings. Accordingly, as to the defendant's second appeal, the judgment is affirmed.

The judgment is affirmed.

In this opinion the other justices concurred.